## NATIONAL LABOR RELATIONS BOARD
### v. EANET et al.
### No. 9792.

United States Court of Appeals
District of Columbia Circuit.

Argued June 15, 1948.

Decided Sept. 27, 1948.

Rehearing March 28, 1949.

Decided Oct. 31, 1949.

Mr. Robert Todd McKinlay, Attorney, National Labor Relations Board, Washington, D. C., with whom Mr. David P. Findling, Associate General Counsel, National Labor Relations Board, Miss Ruth Weyand, Acting Assistant General Counsel, National Labor Relations Board, and Mr. Ben Grodsky, Attorney, National Labor Relations Board, Washington, D. C., were on the brief, for petitioner.

Mr. William H. Collins, Washington, D. C., for respondents.

Before STEPHENS, Chief Justice, and MILLER and PRETTYMAN, Circuit Judges.

PRETTYMAN, Circuit Judge.

This is a petition of the National Labor Relations Board for the enforcement of an order issued by it against the respondents. The Board found the respondents to be engaged in unfair labor practices and to have refused to bargain with a union of employees. It ordered the respondents to cease and desist from warning their employees to refrain from membership in any labor organization; threatening to discharge such employees because of their activities on behalf of any labor organization; questioning the employees concerning their membership in and activities on behalf of any labor organization; ordering such employees "to take vote as to whether they desire to be represented by Hotel Service Workers, Local 80, A. F. of L., or any other labor organizations;" and interfering with the efforts of Hotel Service

Workers, Local 80, A. F. of L., to negotiate for or represent employees. The Board also directed the respondents to post notices in a prescribed form and "Upon request, bargain collectively with Hotel Service Workers, Local 80, A. F. of L., as the exclusive representative of all its employees in the aforesaid appropriate unit, * * *."

The bargaining unit involved in this case consisted of the "bellmen, maids, elevator operators, janitors, housemen, and cleaners" employed at the respondents' hotel. There were either nine or ten[1] of these employees in the unit. The Union established that it had been designated as the collective bargaining representative by six of these employees.

The charge of unfair labor practice rested upon a statement alleged to have been made by a housekeeper to a bellboy, to the effect that if the maids under her supervision joined the Union, she would discharge them. The housekeeper made an affidavit to that effect, but on the witness stand she testified that she and the bellboy were "kidding" and that she said, "I am not going to join the union" and could not remember saying anything further. Counsel for the Board thereupon pleaded surprise and produced the affidavit given by the housekeeper to a field examiner. She then said that the affidavit was correct. The bellboy was not called as a witness. The charge of interference with employees in the exercise of their rights (violation of Section 8 (1) of the Act)[2] rested upon action taken by the manager of the hotel. Agents of the Union called upon him with cards purporting to show that the Union represented a majority of the employees. Some discussion was had, and the Union representatives and the manager executed an instrument called an "Agreement for Cross-Check". Pursuant to that agreement, a notice concerning the cross-check was posted. Thereafter the employees took a vote, apparently among themselves, and turned the ballots over to the manager.

These ballots, according to the manager, were unanimous against representation by the Union. Thereafter there ensued a long discussion in which the respondents refused to bargain with the Union, on the ground that the Union did not represent the employees. The manager testified at the hearing that at the time the cross-check was proposed the field representative of the Board told him that the employer had a right to a cross-check; that he inquired what a cross-check was and was told that it was "a revote on it"; and that the field representative told him that after the agreement was signed, "Then you post a notice downstairs for five days, and then you take a vote." The manager said that they followed these precise instructions. He said:

"I never infoenced [sic] them one way or another, but I did post the notice five days, and I thought that someone was going to come in and ask what happened, but nobody showed up at the end of the five days, and I took the notice down. They made the vote among themselves, one of their representatives did, and they unanimously voted against it. I wrote in to Baltimore and told them that the vote seemed negative, that they weren't interested, and I got a letter back saying that the union had been designated as the representative to bargain."

It would appear from the decided cases that if the housekeeper made the threat of discharge, and if the manager ordered and took the poll of the employees in the manner described by the Board, respondents would have been guilty of violation of the Act. Thus, the case on the merits would depend upon the sufficiency of the evidence to support the findings. But we think that this particular case requires other disposition.

We think that the dates involved in this proceeding are important to the disposition of the case. The controversy between the Union and the respondents occurred in

1. The Board's report states that there were ten employees, but the payroll introduced in evidence showed nine, five maids, three bellboys and one houseman.

2. 49 Stat. 452 (1935), 29 U.S.C.A. § 158 (1).

April, 1946, which was more than two years ago. The hearing was had August 6, 8 and 9, 1946. The trial examiner issued his intermediate report, which contained his findings of fact and recommendations, on October 18, 1946. The Board issued its decision and order, approving the trial examiner's report, on July 31, 1947, which was nine months later. It filed its petition in this court, for enforcement of its order, on March 10, 1948.[3]

In sum total, therefore, we have a case which involves a controversy as to whether six out of nine or ten employees of a small hotel wished more than two years ago to be represented by a designated union. No election has ever been held. It is common knowledge that the personnel, such as bell-boys, elevator operators, maids and janitors, of small hotels constantly changes. The Board asks us not only to require these respondents to refrain from interfering with their employee's joining this one named Local 80 but also to require them to bargain collectively with that named Local 80. The latter requirement is unqualified and unlimited as to time.

An enforcement order of this court is a serious exercise of judicial power and, once such an order is issued, we intend it to be observed, literally and without equivocation. We feel that we must take a realistic view of the present case. There would be nothing realistic, in our view, in directing these respondents to bargain collectively with a named union on the basis of a showing that more than two years ago the union had been selected by six out of nine or ten bellboys, maids and a houseman in this small hotel. We, therefore, decline to issue the enforcement order.

If it be that the conditions found to have existed in April, 1946, continue to exist, the Board can easily bring its information up to date. If the employees wish to organize, or if the Union claims to represent a majority, an election ought to be requested.

Upon the foregoing conditions, the petition of the Board is

Denied.

STEPHENS, Chief Justice.

I think there is evidence to support the finding of the Board that the respondents' housekeeper threatened discharge of employees if they joined a union and evidence to support the finding that respondents' manager took a poll of the employees to determine whether or not they desired to be represented by Local 80, A. F. of L. I think also that the authorities support the conclusion of the Board that such acts constitute violations of Section 8 (1) of the National Labor Relations Act. In my view, therefore, a decree should be issued enforcing the Board's cease and desist order to the extent that it forbids such practices. But I agree with the conclusion of the majority that the court should not on the present record issue a decree enforcing that portion of the Board's order which requires the respondents to bargain collectively with Local 80, A. F. of L.

On Rehearing.

Before STEPHENS, Chief Judge, and WILBUR K. MILLER and PRETTY-MAN, Circuit Judges.

PRETTYMAN, Circuit Judge.

The Board argues that our decision in this matter rested upon the possibility or probability that the Union had lost its majority of respondents' employees between the time of the dispute and the time of submission to the court. Our decision was not upon that basis. We did not know and did not assume or speculate that the Union had lost its majority. To correct the misapprehension, we state again our opinion and decision.

Before we do that, however, we note the rule which the Board itself says is applicable to the hotel industry. The latest announcement by the Board on this subject is In the Matter of White Sulphur Springs Company, Case No. 9–RC–392, decided September 19, 1949. The hotel there involved was a nationally known resort hotel owned and operated by the Chesapeake & Ohio Railroad, having, as is commonly known, a

3. The respondents' brief was filed May 28, 1948.

large number of employees and making large purchases in interstate commerce. In that decision and order, the Board said:

"The Employer contends that it is not engaged in commerce within the meaning of the Act. Although the Employer's operations are not wholly unrelated to commerce, it appears that a cessation of this Employer's operations would have such a remote and indirect effect on commerce that to assert jurisdiction here would not effectuate the policies of the Act.

"To assert jurisdiction here would be to reverse Board precedent untouched since the original Wagner Act was enacted 14 years ago [29 U.S.C.A. § 151 et seq.]. We can find no adequate reason to depart from a practice adhered to administratively by our predecessors and ourselves since 1935. Nothing in the legislative history of the present Act indicates dissatisfaction by the Congress with the Board's long-standing policy. Indeed, the absence of mention of this industry in the hearings or debates leading to the 1947 amendments to the original Act indicates a disposition not to question or disturb the Board's policy."

The case at bar concerns a very small hotel located in the heart of downtown Washington, with ten employees. Nevertheless, the trial examiner concluded, and the Board approved the conclusion, that the activities of this hotel "have a close, intimate, and substantial relation to trade, traffic and commerce within the District of Columbia, and tend to lead to labor disputes burdening and obstructing such commerce and the free flow of commerce." We cannot refrain from viewing this conclusion, in respect to this small local hotel, in the light of the general policy which the Board says it has followed in respect to hotels since 1935 and has applied to so great an operation as that of the Greenbrier at White Sulphur Springs.[1] If the cessation of the operation of the Greenbrier Hotel would have a negligible effect on commerce, it is difficult to see how the cessation of operation of the Parkside Hotel would have a substantial effect on commerce.

The dispute in the case at bar arose in April, 1946, when two business agents of a labor union appeared before the manager of the Parkside Hotel and said that by designation of six bellboys and maids the Union was the bargaining representative of the ten employees in that category. The testimony as to these conversations is confused and conflicting. One of the agents testified that the manager started to make an antagonistic remark but then restrained himself and said that he had no objection to the employees' Union. This witness said, however, that the manager's wife, who was the switchboard operator, repeatedly interrupted the conversations and made declarations of hostility toward unions. The other agent attributed these declarations to the manager himself. Several similar conversations occurred. Important in the controversy at that point was the fact that two bellboys who belonged to the Union had been discharged. But it was later established, apparently to everyone's satisfaction, that one was fired for repeatedly being drunk on the job and the other for giving the room numbers of lady guests to guest sailors, and so that phase of the original trouble disappeared from the case. In any event, the Union filed charges with the Board, and a field representative of the Board called upon the manager. He asked the manager to sign an "agreement for cross check". The manager signed it and gave the Board representative the current payroll as a list of the employees. At this point there is further confusion. The manager testified that he asked what a "cross check" was and was told that it was a re-count or re-vote, and he understood that

---

1. Examination of the published indexes and digests of National Labor Relations Board decisions fails to reveal any other decision upon the policy of the Board in respect to its jurisdiction in the hotel industry, except In the Matter of Willard, Inc., 1937, 2 N.L.R.B. 1094, in which the Board exercised its jurisdiction in a case involving the discharge of employees for union activities, and in which this court issued an enforcement decree. National Labor Relations Board v. Willard, Inc., 1938, 68 App.D. C. 372, 98 F.2d 244.

it meant that the employees were to vote again. The field examiner left the hotel and called on one of the owners. This owner testified that he told the examiner that the manager had no authority to sign the agreement but that the whole matter would be handled by counsel, whom he then called and who made an appointment with the examiner. This field examiner was not called as a witness at the subsequent hearing, and counsel did not testify.

Some time after the interviews above described, the manager received written instructions from the Board to post for five days a printed notice, enclosed, and a copy of the agreement for cross check, also enclosed. The agreement recited that after the five-day posting period, "if the Regional Director is of the opinion that no valid cause to the contrary has been shown," he would issue a "Report on Cross-Check" finding that the Union had been designated. The manager posted the notice and at the end of the five days wrote the field examiner of the Board:

"The attached notice has been posted for five days, and it appears that the employees are not interested.

"Awaiting your further word, I remain,
"Respectfully yours,

"_____"

It appears that during the five days a vote of the employees (the manner being a disputed point in the case) was taken and the ballots given to the manager. These ballots were the basis for the statement in his letter. Without inquiring further of the manager, the Regional Director issued a Report on Cross-Check, reciting that "no valid cause has been shown why this Cross-Check should not constitute complete and final disposition of the question concerning representation."

The taking of the vote during the five-day period is one of the two unfair labor practices found by the Board. The manager testified that he told the employees that he understood they were supposed to vote but that how they voted was none of his business. No one testified to the contrary.

After the Report on Cross-Check, the Board, on July 13, 1946, issued a complaint, and a hearing was had. The trial examiner made his report, exceptions were filed, and the Board reviewed the report, adopted the findings, with some exceptions, and issued its decision and order. It found the owners of the hotel guilty of unfair labor practices, in that (1) the housekeeper had told a bellboy that if the maids joined the Union she would fire them, (2) the manager took a poll of the employees, and (3) the owners refused to bargain with the Union. The Board ordered the owners to cease and desist from (a) warning their employees to refrain from membership in a labor organization (this in spite of the trial examiner's finding that there was no evidence that the employers had so warned the employees) and (b) in any manner interfering with the efforts of Hotel Service Workers, Local 80, A. F. of L., to negotiate for or represent the employees. It directed the employers to post various notices, which notices said, among other things, that the owners would not in any manner interfere with the efforts of Local 80 to represent the employees. The Board ordered the employers to bargain collectively with Local 80 as the exclusive representative of the employees.

On March 10, 1948, the Board filed its petition with this court. The petition recited jurisdictional facts, the entry of the Board's order and the order verbatim, and prayed for a decree of enforcement. The petition contained no allegation that respondents had ignored or refused to obey the order of the Board. The record contains no facts of occurrences since the spring of 1946, and the petition recited none.

This court in a short opinion reflected its view that in a minor case of this sort the Board should bring its information up to date. Instead, the Board moved for a rehearing. We granted the motion, suggesting that a motion to remand for receipt of later and fresher evidence would be entertained. The Board rejected the suggestion, its counsel stating flatly in their brief on rehearing, " * * * the Board has authorized us respectfully to advise this Court that if a motion to remand the

case to the Board were granted, the Board would feel compelled, upon the basis of its prior decisions and upon what it regards as controlling Supreme Court decisions, to reaffirm its order directing respondents to bargain." And later in their brief they said: "In the light of this well-settled doctrine, the Board has, as we have noted, authorized us to advise this Court that if the case were to be remanded to the Board, the Board would adhere to its previous order." And again they said: "Since the Board upon a remand of the case would adhere to its prior order, it follows that no good purpose would be served by remanding the case to the Board." Thus, the Board declines our suggestion, and we are limited to the record as originally made, of events which occurred in the spring of 1946.

Our disposition of the case was upon consideration of the following features, not merely one of them alone but the composite. The incidents from which the controversy arose occurred two years before the Board brought its petition to this court. There was no later evidence. The dispute itself, even if established to exist as alleged, was utterly minor, about as significant as a street-corner brawl. There was no evidence of antagonism or obduracy on the part of the employers. At most, theirs was a state of confusion, which they sought to resolve by resort to counsel. There was no evidence of the slightest helpful response from any Board representative. The two alleged unfair labor practices were shown only by slight fractions of evidence, taken out of setting. The selectivity displayed by the finder of the facts was startling. The conclusions which the Board reached were confused and inconclusive in critical parts. The trial examiner, and later the Board by adoption, concluded that "The record contains no support for the allegation in the complaint that the respondents have 'urged, persuaded and warned' their employees to refrain from joining the Union." But at the same time it concluded that "respondents interfered with, restrained, and coerced their employees in the exercise of the rights guaranteed in Section 7 of the Act [collective bargaining]". That bellboys and maids in very small hotels are in the main a floating sort of labor is well enough known. Upon the rehearing we were advised that only one of the employees at the hotel in 1946 is still there. In sum, this was a very insignificant, very doubtful, and very old case on the Board's docket. Under that combination of circumstances, we were of the view that a judicial decree of enforcement would not be appropriate, but intimated, and later suggested, that some sort of information less than two years old might be pertinent to further consideration.

The important question in the case concerns the function of the court under the statute which controls us. Does the court have a modicum of judicial discretion in passing upon this petition for an enforcement decree? Or is it required to put the stamp of its authority automatically upon whatever request is made of it? The statute which governs the procedure [2] provides that the Board may petition the court and, if a petition be filed, shall file with the court the entire record of the proceedings. Then the statute provides: "Upon such filing, the court * * * shall have jurisdiction of the proceeding and of the question determined therein, and shall have power * * * to make and enter upon the pleadings, testimony, and proceedings set forth in such transcript a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board." Thus, the Board is a petitioner in the court. The court has jurisdiction of the question in the case. The decree, when entered, is a judicial order. Violation of it is contempt of court. This procedure is not provided in all statutes. More often, an appeal is provided, and the administrative order, even when affirmed, remains an executive action. [3]

2. Sec. 10 (e) of National Labor Relations Act as amended, 61 Stat. 147 (1947), 29 U.S.C.A. § 160 (e).

3. The provisions of many statutes are collected and discussed in Cyclopedia of Federal Procedure §§ 7333–7369 (2d ed. 1944).

The interposition of the judiciary as the enforcing agency must have some meaning. In National Labor Relations Board v. Crompton-Highland Mills,[4] the Supreme Court indicated quite definitely that the issuance of a decree and, if issued, its scope and terms are, to some extent at least, matters for consideration by the court. To the same effect are expressions in National Labor Relations Board v. Express Pub. Co.[5] Chief Judge Parker, writing for the Circuit Court of Appeals for the Fourth Circuit, discussed the problem in National Labor Relations Board v. Norfolk Shipbuilding & Drydock Corp.[6] and summarized the answer by the expression "appropriate for present enforcement". With the views which he expressed, we agree. This was the rationale of Franks Bros. Co. v. National Labor Relations Board[7] and similar cases. While the original records in those cases were not recent, the petitions for enforcement decrees were upon fresh determinations by the Board that enforcement was presently appropriate.

■ Substantial considerations support the view that the court should require some reasonably recent indication that a decree is warranted. The function imposed by the Congress upon the courts by this statute is a major one. The Board was not given enforcement power; that power was lodged in the courts as a judicial function. Its exercise is not merely mechanical. The courts cannot, of course, refuse to issue enforcement decrees where the Board has found facts and reached conclusions which indicate that, in accordance with its judgment, enforcement is presently appropriate. But surely enforcement must appear to be presently desirable before the solemn power of the courts is brought to bear upon the dispute. Idle, pointless court decrees are not helpful to enforcement of the law, but may be actually harmful. Law enforcement is an art; it is not the mere unthinking application of mathematical absolutes. Moreover, entry of decrees unrelated to

present reality is not countenanced by our jurisprudence. In an ordinary law suit of the magnitude of the case at bar, we venture to say that no court would enter a mandatory or injunctive decree on data two years old.

Particularly, we do not think that this statute contemplates that the Board can pass on to the courts the problem of enforcement in extremely minor matters, without some showing of a reasonably recent necessity. The federal judiciary has had sad experience with a practice which put upon it the problems of magistrate courts.

Ordinarily these minor disputes are soluble by reasonable conciliatory efforts. No evidence of any such attempts on the part of the Board's representatives appears in this record. There were the one call by the field examiner, the formal notices and letters, the adversary proceeding in most formal fashion, and no more. Clearly, this minor controversy was inserted in some administrative procedural slot and, solely by reflection of the importance of the processes through which it was put, was magnified to noticeable size. The inflexibility of the Board's consideration is well illustrated by what it tells us, in its brief, concerning an election, which was suggested by these respondents. The Board says: "A well-conducted election calls for expert and experienced judgment in providing procedures and safeguards in such essential matters as (1) unsuggestive statement of the issue; (2) preparation of eligibility lists; (3) identification of voters; (4) time limits upon and methods for challenges to the eligibility of voters, the marking of a ballot, or the phase of an election; (5) tally of ballots; (6) impounding of disputed ballots; (7) opportunity to place observers; (8) announcement and certification of results; and (9) methods for resolving disputes which inevitably arise in connection with an election." All this necessary formality is explained to us when the question at issue is the choice

4. 1949, 337 U.S. 217, 69 S.Ct. 960.

5. 1941, 312 U.S. 426, 436–437, 61 S.Ct. 693, 85 L.Ed. 930.

6. 1949, 172 F.2d 813, 816.

7. 1944, 321 U.S. 702, 64 S.Ct. 817, 88 L. Ed. 1020.

of a union by six out of ten bellboys and housemaids in a very small hotel.

We held, and we hold, on the basis of the whole record before us, that an enforcement decree ought not to be entered in this case in the absence of any showing whatever, based on reasonably recent inquiry, that a decree of court is appropriate or necessary.

In our first opinion, we made reference to the findings of the Board but found it unnecessary to examine the substance of the evidence supporting them. The statute governing this proceeding [8] provides: "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." It is established that substantial evidence is evidence upon which a reasonable man would act in his own affairs. Upon this record as a whole, there is no such evidence supporting the findings of unfair labor practices or refusal to bargain. We have discussed the matter of the poll. The affair of the housekeeper and the bellboy was even less substantial. On the witness stand the housekeeper said that she and the bellboy were "kidding", and she did not testify to any threat. The Board's counsel, who presented her as a witness, pleaded surprise and produced an affidavit which had previously been secured from the witness. When he offered it and opposing counsel objected, the trial examiner said, "I don't see what the whole thing amounts to anyway." Forthwith the discussion on the item was dropped. Nevertheless, in the final finding, one of the two unfair labor practices charged to the employers was one sentence taken from that affidavit. In its context and in the setting of the testimony, the remark, even if made, was a casual and inconsequential exchange of banter between the lady and a teasing bellboy. The trial examiner's remark at the time seems to be an accurate evaluation.

As to the failure or refusal to bargain, it is true that the attorney for the Union testified on direct examination that he received no answers to his letters to the owners and that "I received no affirmative answer to my request for a meeting for collective bargaining." But on cross examination he testified that the owner referred him to counsel, that he talked to counsel several times, that they rehashed the matter of the cross-check, and that counsel contended that so far as the company knew the Union did not represent the employees. There was no evidence that any representative of the Board took any steps whatever to assure or reassure the employers, beyond the mailing of the formal Report on Cross-Check. This perplexity of the employers is translated by the Board into refusal and defiance. That the employers had a right to test the validity of the selection of one purporting to be the bargaining representative of the employees is established.[9] That test came upon the hearing of the complaint. There is no evidence whatever in this record as to the employers' attitude or action after the order of the Board was issued. An employer cannot test that selection if his protest is to be treated as an unfair labor practice and his action after the announcement of the result is treated as immaterial.

What this court has done, and does, in this case is to say to the Board: In so insignificant a controversy, upon events which occurred so long ago, upon such shadowy evidence, ascertain by some reasonably adequate and certain inquiry whether these employers are refusing to bargain with the duly designated representative of their employees and whether their practices do in reasonable reality require a decree of court.

We have not said, and do not say, that if these employers refuse to bargain with the duly designated representative of their employees even if the unit is only ten people, we will not issue an enforcement decree. We do say that if the Board insists upon court decrees in matters of this insignificant character, it must present reasonably

---

8. Supra note 1; 29 U.S.C.A. § 160(e).

9. Norris, Inc., v. N. L. R. B., 1949, 85 U.S.App.D.C. ——, 177 F.2d 26.

recent and accurate information upon which the court may act.

The opinion, order and decree of this court of September 27, 1948, which were vacated March 1, 1949, for the purposes of the rehearing, are hereby reinstated and, as supplemented by this opinion, are made the opinion, order and decree of the court.

STEPHENS, Chief Judge, dissenting.

I think the order of the Board must be enforced. In my view, there is substantial evidence to support the finding of the Board that the respondents' housekeeper—supervisor of maid service—threatened discharge of employees, to wit, maids, if they joined a union. It is true that in one part of the housekeeper's testimony she said that she did not make such a threat. But immediately afterwards, when shown an affidavit the signature upon which she identified as her own, she testified that a statement therein that she had told a bellboy that if the maids joined a union she would "fire" them was true. The Board's trial examiner found that this was not a mere isolated statement, but that it reflected the attitude of the management of the hotel— this because the hotel manager had stated to representatives of the union who called upon him to request that he bargain collectively with them: "Well, if they [the employees] belong to the Union, why are they working here?" The testimony as to this statement was uncontradicted. The Board adopted the trial examiner's finding. The conflict within the testimony of the housekeeper was for the Board to resolve as a trial tribunal. National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368 (1941).

I think there is substantial evidence to support the finding of the Board that the respondents' manager took a poll of the employees to determine whether or not they desired to be represented by the union. At several points in the course of the hearing before the trial examiner, the manager tes-tified that he had taken a vote or questioned the employees as to whether they wanted the union or not. At one point he testified that: "After hearing from the union I questioned each employee as to whether they wanted the union or not, and I am of the impression that they do not want a union." It is true that on direct examination by counsel for the respondents, the manager testified that in connection with the arrangements for a cross-check he was given the impression by representatives of the Board that he was himself entitled to take a vote of the employees.[1] But on cross-examination by counsel for the Board, the manager, when asked whether a representative of the Board had said anything to him before he signed the cross-check agreement about an election held by secret ballot as one of the means used by the Board to determine bargaining agents, said that he did not remember that the representative had made any such statement and that the representative gave him no other choice than the cross-check. Moreover, the cross-check agreement, signed by the manager, was introduced in evidence and it shows upon its face that the "cross-check of appropriate Union and Employer records shall be made under the direction and supervision of the Regional Director . . . ." Thus again there is a conflict in the evidence which it was for the Board to resolve as a trial tribunal.

I think there is substantial evidence to support the finding of the Board that the union had been chosen as collective bargaining agent by a majority of the respondents' employees in the appropriate unit. Authorization cards authenticated by the uncontradicted testimony of a business agent of the union were received in evidence. They show that a majority of the respondents' employees in the appropriate unit (including maids, bellboys and houseman) designated the union as their representative for collective bargaining. The correctness of the finding of the Board

1. A cross-check is a procedure carried out by the Board under an agreement between a union and an employer for the purpose of ascertaining whether or not signature cards, offered by the union as evidencing a majority vote of employees selecting it as a bargaining agent, are in truth cards executed by bona fide employees of the industrial unit in question.

that the respondents refused to bargain collectively with the union is not in dispute.

It is not in dispute that threatening discharge of employees if they join a union, conducting a poll to determine whether or not employees desire to be represented by a union, and refusing to bargain with a duly selected collective bargaining representative are unfair labor practices on the part of an employer.

The foregoing reflects the view which I more briefly expressed in my separate opinion on the original decision of this case. I nevertheless then thought that in view of the two-year lapse of time between the selection of the union as the collective bargaining representative of the employees and the enforcement proceeding, and in view of the likelihood of change of employee personnel during that time, the court should decline to enforce the order of the Board until shown by the Board that the conditions found to have existed as the basis for its order continued to exist. But a petition for rehearing was granted after the original decision of the case, and after hearing the argument and considering the authorities presented at the rehearing, I have concluded that my view—expressed in my separate opinion on the original decision of the case—that the order of the Board should not be enforced on the present record, was incorrect. In Franks Bros. Co. v. National Labor Relations Board, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944), wherein it appeared that a union, subsequent to a wrongful refusal to bargain, had lost its majority among the employees, the Supreme Court held that the Board's order to bargain must nevertheless be enforced. The Court said:

. . . One of the chief responsibilities of the Board is to direct such action as will dissipate the unwholesome effects of violations of the Act. See 29 U.S.C. § 160(a) and (c). And, "It is for the Board, not the courts, to determine how the effect of prior unfair labor practices may be expunged." *International Association of Machinists [Tool and Die Makers Lodge No. 35] v. [National] Labor [Relations] Board,* 311 U.S. 72, 82 [61 S.Ct. 83, 85 L.Ed. 50].

That determination the Board has made in this case and in similar cases by adopting a form of remedy which requires that an employer bargain exclusively with the particular union which represented a majority of the employees at the time of the wrongful refusal to bargain despite that union's subsequent failure to retain its majority. The Board might well think that, were it not to adopt this type of remedy, but instead order elections upon every claim that a shift in union membership had occurred during proceedings occasioned by an employer's wrongful refusal to bargain, recalcitrant employers might be able by continued opposition to union membership indefinitely to postpone performance of their statutory obligation. . . .

Contrary to petitioner's [Franks Bros.] suggestion, this remedy, as embodied in a Board order, does not involve any injustice to employees who may wish to substitute for the particular union some other bargaining agent or arrangement. For a Board order which requires an employer to bargain with a designated union is not intended to fix a permanent bargaining relationship without regard to new situations that may develop. See *Great Southern Trucking Co. v. [National] Labor [Relations] Board,* 139 F.2d 984, 987. But, as the remedy here in question recognizes, *a bargaining relationship once rightfully established must be permitted to exist and function for a reasonable period in which it can be given a fair chance to succeed.* See *[National] Labor [Relations] Board v. Appalachian [Electric] Power Co.,* 140 F.2d 217, 220–222; *[National] Labor [Relations] Board v. Botany Worsted Mills,* 133 F.2d 876, 881–882. *After such a reasonable period* the Board may, in a proper proceeding and upon a proper showing, take steps in recognition of changed situations which might make appropriate changed bargaining relationships. *Id.*; see 29 U.S.C. § 159(c). [Italics supplied] [321 U.S. at pages 704–706, 64 S.Ct. at pages 818, 819]

Since in the instant case it is not in dispute that the respondents refused to bargain with the union, and not contended by the respondents that they have complied with the order of the Board since its issuance, but contended only that the order was improper and invalid, the Franks Bros. case is, in my view, clearly controlling upon this court. Other decisions to similar effect are: National Labor Relations Board v. The Andrew Jergens Company, 175 F.2d 130 (C.C.A. 9th 1949); National Labor Relations Board v. Todd Co., 173 F.2d 705 (C.C.A.2d 1949); National Labor Relations Board v. Arnolt Motor Co., 173 F.2d 597 (C.C.A. 7th 1949); National Labor Relations Board v. Norfolk Shipbuilding & Drydock Corp., 172 F.2d 813 (C.C.A. 4th 1949).

It is to be noted, moreover, that in view of 29 U.S.C.A. § 160(f), the respondents could have sought prompt judicial review of the Board's order had they seen fit to do so. See National Labor Relations Board v. Todd Co., supra. Therein the Court of Appeals for the Second Circuit said:

. . . The company contends that enforcement of the Board's order should be denied because the Board waited from October 4, 1946 until January 23, 1948, to seek enforcement through a court order. We cannot agree. The company could have sought prompt judicial review of that order, under 29 U.S.C.A. § 160(b). Not having done so, and having failed to comply with that order, it is in no position to complain of any change of circumstances during the period of non-compliance.[2] [173 F.2d at page 708]

It may well be that, as suggested by my brethren, this case could have been dealt with more effectively by the Board through conciliation than through an adversary proceeding, i. e., through a complaint charging unfair labor practices. But this, I think, is a matter of administrative policy and not one for judicial direction. Moreover, the fact that the industrial unit is small is, in my view, not a proper basis for refusing to enforce the order of the Board. Employees in a small industrial unit may be even more in need, in order that they may enjoy the rights of free choice of representatives for collective bargaining guaranteed by the National Labor Relations Act, of the protective action of the Board through an unfair labor practice proceeding than employees who, in a large unit, because of their strength of numbers and lesser proximity with supervisors, are less susceptible to interference with these rights. In any event, the rules for review and enforcement of the Board's orders are the same whether the case be of "minor" or "major" character.

I think the case cannot properly be disposed of adversely to the Board upon the ground that commerce as defined in the Act is not affected as required by the Act for jurisdictional purposes. Under 29 U. S.C.A. § 152(6), commerce, so far as relevant to this case, means "trade . . . within the District of Columbia . . . "; and under Section 152(7) the term "affecting commerce" is defined to mean those acts which burden the free flow of commerce, and those acts which tend to lead to labor disputes which burden the free flow of commerce. It was stipulated before the trial examiner that during the calendar year 1945 the respondents' gross income exceeded $75,000, and that their purchases exceeded $25,000. The trial examiner so found and the Board adopted the finding. In view of this record I think it must be said that commerce within the District of Columbia is involved. And the finding of the trial examiner, adopted by the Board, that the activities of respondents "have a close, intimate, and substantial relation to trade, traffic and commerce within the District of Columbia, and tend to lead to labor disputes burdening and obstructing such commerce and the free flow of commerce," has not been contested at any stage of the case.

It is true that the Board held in the White Sulphur Springs Company case, No. 9-RC-392 (1949), that a cessation of seemingly substantial expenditures and activities in interstate commerce would have such a remote and indirect effect upon such commerce that to assert jurisdiction would not effectuate the policies of the Act. But it does not follow that the Board would rule that the cessation of such expenditures and activities in local commerce would have such a remote and indirect effect upon that commerce that to assert jurisdiction would not effectuate the policies of the Act in a situation where the Board has authority to deal with acts in and affecting local commerce, as in the District of Columbia and the Territories. The statement of the Board in the White Sulphur Springs Company case that it has been its administrative policy adhered to since 1935 not to assert jurisdiction over the hotel industry overlooks the exercise of jurisdiction by the Board in the instant case. Moreover, I think the Board cannot properly, under the Act, have a general policy which would forbid the exercise of its jurisdiction in a particular case where, as in the instant case, commerce is involved and where, as found in the instant case, the activities of the employer have a substantial relation to commerce and tend to lead to labor disputes burdening and obstructing such commerce and the free flow thereof.

2. The reference to Section 160(b) of the statute is in error. The correct reference is Section 160(f)).