**C–B BUICK, INCORPORATED,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**
No. 73–2068.

United States Court of Appeals, Third Circuit.

Argued Sept. 6, 1974.

Decided Nov. 14, 1974.

---

H. David Rothman, Pittsburgh, Pa., for petitioner.

William H. DuRoss, III, Atty., Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., for respondent.

Before SEITZ, Chief Judge, and GIBBONS and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

Petitioner C–B Buick, Inc. (Buick) appeals from that portion of the September 17, 1973 order of the NLRB (Board) which held that the petitioner had committed an unfair labor practice by violating Section 8(a)(5) and (1) of the National Labor Relations Act.[1] The violation found by the Board was petitioner's refusal to furnish certain financial data requested by the Union[2] during collective bargaining sessions. On this appeal we are asked by petitioner to set aside that provision of the Board's September 17, 1973 order which requires Buick to furnish the Union with the requested data. The Board has filed a cross-petition to enforce its entire order.[3] For the reasons set forth below,

1. 29 U.S.C. § 158(a)(5) and (1) provides: "(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; . . .

. . . . .

(5) to refuse to bargain collectively with the representative of his employees, subject to the provisions of section 159(a) of this title."

Section 8(d) of the Act, 29 U.S.C. § 158(d), provides:

"For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder."

2. The Union is the International Association of Machinists & Aerospace Workers, District Local 63, AFL-CIO.

3. The original order was issued by the Administrative Law Judge and in relevant part provided:

Respondent C-B Buick, Inc., its officers, agents, successors and assigns shall:

1. Cease and desist from:

(a) Bypassing the Machinists and dealing directly with its employees concerning the Machinists' demands for a new contract and threatening them that such demands or a strike to enforce them might cause it to go out of business; telling its employees that they could do better . dealing with it through a supervisor than through their exclusive bargaining agent.

(b) In any like or related manner interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act:

(a) Upon request bargain collectively and exclusively with Machinists as the exclusive bargaining representatives of the unit

we decline to enforce so much of the Board's order as would require Buick at this time to furnish the financial data previously sought by the Union.

## I.

In 1971, the Union was certified as the exclusive bargaining representative for eight service-and-parts department workers employed by Buick. Thereafter, Buick and the Union entered into a one-year collective bargaining agreement which expired on June 30, 1972. Prior to the expiration of this agreement, the Union's business representative submitted certain demands to Buick relevant to a new agreement. Some four days prior to the first bargaining session (which had been scheduled for July 19, 1972) Buick's president unilaterally met with the employees and informed them that Buick could not afford the Union's demands and that if these demands had to be met Buick might be forced to close. This meeting, and a subsequent after-hours meeting at which Buick's supervisor advised against union representation, led to the finding by the Board that Buick had violated Section 8(a)(5) and (1) of the National Labor Relations Act (Act).[4]

At the first two bargaining sessions held on July 19, 1972 and August 2, 1972, the Union's demands were discussed. Buick's position at both sessions was that it could not afford to meet the various Union proposals. The Union thereupon asked to see Buick's profit and loss statement,[5] to determine

for purposes of further contract negotiations whether Buick's plea of poverty could be substantiated. Buick denied this request at the same time as it submitted counter proposals. Before the August 2, 1972 session ended however, Buick, without abandoning its position that the Union could not see its books, gave the Union an oral statement of Buick's "pre-tax profits" for the preceding year. This session, like the first, ended without agreement on any issue.

On August 9, 1972 the Union filed with the NLRB an unfair labor practice charge against Buick, claiming (1) that Buick had bypassed the Union and dealt directly with its employees and had threatened them, and (2) that Buick had refused to disclose to the Union relevant employer financial data after asserting that Buick could not afford the Union contract proposals. The Administrative Law Judge who conducted the NLRB hearing on November 20, 1972, concluded that although Buick violated Section 8(a)(5) and (1) by its direct dealings with and threats to its employees, Buick *had not* committed an unfair labor practice in failing to bargain collectively when it refused to provide the Union with the financial data requested during the bargaining sessions. The NLRB's General Counsel filed limited exceptions to the Law Judge's conclusions urging the Board to conclude that Buick's conduct in refusing to furnish the Union with financial information constituted an unfair labor practice. NLRB v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100

found appropriate herein concerning rates of pay, wages, hours and terms and conditions of employment and, if agreement is reached, embody such understanding in a written agreement.

On September 17, 1973, the Board amended the original order by adding paragraph 2(b), which requires Buick to:

(b) Furnish the Union, on request and within a reasonable time, that information sought by the Union relating to the Respondent's claimed inability to pay the wage increases and other benefits requested by the Union.

Buick does not challenge any provision of the Board's final order other than para-

graph 2(b). The Board seeks enforcement of the order as amended.

4. On this appeal, Buick does not challenge this finding.

5. The Union's request for Buick's financial data sought an examination of the profit and loss statement and "the books." (Tr. 65–66). Though this request was somewhat vague, Buick's duty to furnish information on the Union's request is not defeated by the failure to ask for the precise kind of information which the employer has available, as long as the employer has data of a similar nature to that requested by the Union. *See* NLRB v. Western Wirebound Box Co., 356 F.2d 88 (9th Cir. 1966).

L.Ed. 1027 (1956). On September 17, 1973, the Board, with one dissent, reversed the Administrative Law Judge's conclusion and amended his order to require, *inter alia,* Buick to furnish the Union, "on request and within a reasonable time, that information sought by the Union relating to the respondent's [Buick's] claimed inability to pay the wage increases and other benefits requested by the Union." (*see* footnote 3, *supra*).

Between the hearing conducted by the Administrative Law Judge on November 20, 1972 and the Board's order of September 17, 1973, negotiations between Buick and the Union had continued and on March 13, 1973 the parties entered into a new collective bargaining agreement.[6] Buick thereupon petitioned the Board for reconsideration and for a stay of enforcement of the financial disclosure portion of the order, arguing that the signing of a new collective bargaining agreement mooted this issue. Buick's petition was denied by the Board, with one dissent, on November 15, 1973. Thereupon, Buick sought this review[7] of the Board's order contending that so much of the order requiring disclosure of financial data should be set aside. Buick argues that the Board erred in finding Buick's conduct to constitute an unfair labor practice, and that the disclosure issue is now moot in light of the existing collective bargaining agreement. The Board opposes such action and requests enforcement of its September 17, 1973 order.

## II.

### TRUITT VIOLATION

Buick argues, *inter alia,* that its refusal to supply the requested financial data was not a violation of the Act inas-much as the Union was not bargaining in good faith and was the intransigent party. *See, e. g.,* Boston Herald-Traveler Corp. v. NLRB, 223 F.2d 58, 63 (1st Cir. 1955). In support of this contention, Buick relies on the Administrative Law Judge's finding[8] that the Union, as the "intransigent" caused the breakdown in negotiations. Buick claims that the Board acted arbitrarily and in disregard of the Administrative Law Judge's credibility determinations when it concluded that the breakdown in negotiations "was not so much due to intransigence on the part of the Union . . . as it was due to Respondent's [Buick's] adamancy in refusing to furnish the requested financial data."[9]

In reviewing Buick's bargaining posture, the Board correctly recognized that Buick's refusal to furnish the information requested of it must be examined in light of the Supreme Court's decision in NLRB v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956). In *Truitt,* the Union demanded a 10¢ per hour wage increase. Truitt, the respondent, offered a 2½¢ per hour increase, claiming that it could not afford to pay more and that any amount above 2½¢ would "put it out of business." The employer refused to permit an examination of its books when the Union asked for substantiation of its claimed inability to pay. The Supreme Court sustained the Board's position that "an employer has not bargained in good faith where the employer claims it cannot afford to pay higher wages but refuses requests to produce information substantiating its claim." 351 U.S. at 150, 76 S.Ct. at 754. In so holding, the Supreme Court stated:

"In their effort to reach an agreement here both the union and the

---

6. The new collective bargaining agreement is for a term of three years. It contains substantially the same provisions as were contained in the preceding one-year contract. The current collective bargaining agreement provides, however, for an increase in wages, holidays and fringe benefits.

7. We have jurisdiction to entertain this matter pursuant to 29 U.S.C. § 160(f).

8. Decision of Administrative Law Judge, JD–33–73, Case No. 6–CA–6244, at 10. (Issued January 30, 1973).

9. C–B Buick, Inc. and International Ass'n of Machinists & Aerospace Workers, District Lodge No. 63, AFL–CIO, 206 NLRB No. 10, 84 LRRM 1173, 1175 (1973).

company treated the company's ability to pay increased wages as highly relevant. The ability of an employer to increase wages without injury to his business is a commonly considered factor in wage negotiations. Claims for increased wages have sometimes been abandoned because of an employer's unsatisfactory business condition; employees have even voted to accept wage decreases because of such conditions."

"Good-faith bargaining necessarily requires that claims made by either bargainer should be honest claims. This is true about an asserted inability to pay an increase in wages. If such an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy."

351 U.S. at 152–153, 76 S.Ct. at 755. (footnote omitted).

This Court has held that it is a *per se* violation of the Act for an employer to refuse to furnish relevant requested information in the *Truitt* context. Curtiss-Wright Corp., Wright Aeronautical Division v. NLRB, 347 F.2d 61, 69 (3d Cir. 1965). Buick's conduct and the record as developed therefore must be examined in light of these principles. The Board's findings with respect to these facts bearing on its disclosure order will not be set aside if supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). We adhere to this standard even in instances, where as here, the Administrative Law Judge and the Board may differ. International Union of Elec., Radio and Machine Workers, AFL–CIO v. NLRB, 273 F.2d 243, 247 (3d Cir. 1959). The record reveals that the Board's con-

clusion is in accord with law and rests upon findings which are supported by substantial evidence. Hence, on review, we will not disturb the Board's conclusion that a *Truitt* violation occurred. NLRB v. Truitt Mfg. Co., *supra; see* Universal Camera Corp. v. NLRB, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951); International Union of Elec., Radio and Machine Workers, AFL–CIO v. NLRB, *supra.*

Buick, however, is not obliged to disclose to the Union its profit and loss data and its "books" merely because they might be helpful to the Union. *See* United Furniture v. NLRB, 388 F.2d 880 (4th Cir. 1967). It is only where an employer, in asserting its financial inability to meet the demands of the union refuses to disclose its relevant financial data that the *Truitt* doctrine is applicable. Under such circumstances an employer must disclose, and a union must be permitted to know, the factual basis substantiating the employer's assertion of economic inability. NLRB v. Truitt Mfg. Co., 351 U.S. at 152–153, 76 S.Ct. 753. If it were otherwise, the collective bargaining processes would be frustrated. Here, if the Union could not meaningfully evaluate Buick's economic claims it could not determine whether the claims of financial inability were valid or spurious. Thus, absent Buick's compliance with the *Truitt* mandate, the Board was justified in holding that Buick failed to bargain in good faith.[10]

### III.

### ENFORCEMENT

Our task, however, has not been completed with our determination that Buick's refusal to furnish financial information was properly held to consti-

---

10. We reject Buick's contention that its oral statement to the Union of its preceding years "pre-tax profits" sufficed to substantiate its claim of economic inability and sufficed to bar a finding of an unfair labor practice premised upon a *Truitt* violation. A partial oral presentation of financial data, even if it is of an uncomplicated nature, can-

not be held to have satisfied the employer's duty to furnish information to the Union in a context such as this one. *Cf.* J. I. Case Co. v. NLRB, 253 F.2d 149 (7th Cir. 1958). Moreover, the information to be furnished must be from current data. *See* NLRB v. Rybold Heater Co., 408 F.2d 888 (6th Cir. 1969).

tute a violation of the Act. We must still resolve the question of whether we should presently enforce the Board's disclosure order.

■ Our power to enforce Board orders is equitable in nature and is properly invoked only when the relief sought is consistent with principles of equity. NLRB v. Kingston Cake Co., 206 F.2d 604, 611 (3d Cir. 1953). Accordingly, where the power of this Court is to be exercised for the enforcement of a Board order requiring the disclosure of financial data, the order must be appropriate for *present* enforcement. NLRB v. Eanet, 85 U.S.App.D.C. 371, 179 F.2d 15, 17, 21 (1948), reh. denied, 179 F.2d 17 (1949). *See also* New Standard Publishing Co., Inc. v. Federal Trade Comm., 194 F.2d 181, 183 (4th Cir. 1952). When enforcing Board orders our function is not to put our stamp of authority automatically upon whatever request is made of us, NLRB v. Eanet, *supra*, nor should we enter an enforcement decree " . . . in the absence of any showing whatever, based on reasonably recent inquiry, that a decree of court is appropriate or necessary." NLRB v. Eanet, 179 F.2d at 22. An order of the Board when judicially confirmed must " . . . like the injunction order of a court, state with reasonable specificity the acts which the respondent is to do or refrain from doing . . . ." NLRB v. Express Publishing Co., 312 U.S. 426, 433, 61 S.Ct. 693, 698, 85 L.Ed. 930 (1941).

With these teachings in mind, we direct our inquiry first to Buick's contention of "mootness" and then to the controlling issue of relevance.

## IV.
## MOOTNESS

Buick asserts that even if it is held to have committed an unfair labor practice in refusing to furnish requested financial data to the Union (as we so hold), the Board's order requiring disclosure should be denied enforcement. Buick argues that the three-year collective bargaining agreement executed *after* Buick failed to make disclosure of its books renders present disclosure moot. Buick claims that any information it could be obliged to furnish now has been made stale by the passage of time and can serve no useful purpose to the Union either in its role as a bargaining agent or in its role administering the new collective bargaining agreement.

On the other hand, the Board contends that the subsequent execution of the collective bargaining agreement does not "moot" its disclosure order. The Board argues that the forced production of Buick's economic information would prevent Buick from profiting from its unfair labor practice. Such information, says the Board, could also be used by the Union in "(1) implementing, enforcing or modifying the current agreement; (2) proposing additional requests; (3) formulating future demands or requests; and/or (4) evaluating and assessing the credibility of Respondent's assertions and claims or the viability of its bargaining position during future negotiations and meetings." [11]

We requested additional post argument briefing, concerning the effect of implementing the Board's proposed order at this time, during the period of the existing agreement; [12] and at its termination.

11. Counsel for General Counsel's Opposition to Respondent's Petition for Reconsideration, For Remand to Adduce Additional Evidence if Necessary and for a Stay of Enforcement, Case No. 6–CA–6244, dated October 29, 1973.

12. Article 3 of the existing collective bargaining agreement provides as follows:
   The Company agrees that it will negotiate with the Union during the term of this

Agreement concerning any matter involving the wages, hours and working conditions of the employees which is not specifically provided for in this Agreement. Any disputes which are not settled by negotiations shall be subject to the Grievance and Arbitration Provisions, provided for in this Agreement.
Article 20 establishes a four-step grievance procedure;
Article 21 provides for arbitration.

A Board order, lawful when made, does not become moot [13] solely "because changing circumstances indicate that the need for it may be less than when made." NLRB v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 576, 82 L.Ed. 831 (1938); *see also* NLRB v. Raytheon Co., 398 U.S. 25, 90 S.Ct. 1547, 26 L.Ed.2d 21 (1970). Indeed, under the circumstances presented here, we reject Buick's contention that the signing of a collective bargaining agreement subsequent to a *Truitt* violation by the employer automatically renders moot a Board order under review which pertains to the refusal to furnish relevant information. We regard Buick's proscribed conduct as being capable of repetition in some relevant context with the Union. *Cf.* Allee v. Medrano, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974). The significance of the contract execution on March 13, 1973 must therefore be measured by considerations of relevancy (*see* our discussion *infra*) rather than by considerations of mootness.

## V.

## RELEVANCE

An essential ingredient in establishing an unfair labor practice under the doctrine announced in *Truitt* is that the information withheld be relevant. Relevance, in this case, should be measured with respect to the Union's statutory functions [the negotiation and administration of the collective bargaining agreement, NLRB v. Acme Indus. Co.,

385 U.S. 432, 437, 87 S.Ct. 565, 17 L. Ed.2d 495 (1967); International Tel. & Tel. Corp. v. NLRB, 382 F.2d 366, 371–372 (3d Cir. 1967), cert. denied, 389 U.S. 1039 (1968)] and with respect to the ongoing relations of the parties.

### A. *Negotiation*

Based on the record presented, there is no showing that the information requested during the period of contract negotiations in July and August 1972 is relevant or can be of use to the Union in carrying out its statutory responsibility as an exclusive bargaining agent. While the provision of the Board's order here challenged does not delineate the period of time for which records must be produced, the Board has conceded in its supplemental brief that its order pertains only to those records of Buick which were in existence and available on or before July 19, 1972. There are no pending bargaining negotiations between Buick and the Union. On this record, we find it difficult to understand how the financial data requested by the Union on July 19, 1972 and on August 2, 1972 is now relevant to a present negotiating or bargaining issue, even though we hold that such relevance once existed. We have not been shown and we will not speculate that the disclosure of Buick's 1971 or 1972 financial data [14] at this time can serve any useful collective bargaining purpose. *Cf.* NLRB v. Eanet, *supra*. In so holding, we reject the Board's contention that if Buick's records indicated that Buick could have afforded higher labor costs, the Union could presently modify the existing agreement's wage or benefit provisions

13. We can consider the issue of mootness although it obviously was not raised before the Administrative Law Judge. When after the issuance of an NLRB order, circumstances arise which may affect the propriety of enforcing the order, this Court has discretion to decide the matter itself or to remand it to the Board for further consideration. NLRB v. Jones & Laughlin Steel Corp., 331 U.S. 416, 67 S.Ct. 1274, 91 L.Ed. 1575, reh. denied, 331 U.S. 868, 67 S.Ct. 1725, 91 L.Ed. 1872 (1947). We regard the issue before us as essentially one of law, and we do

not find it necessary to remand this proceeding for further factual findings.

14. The initial demand for financial data was made in July 1972. The record is silent as to the manner and form of Buick's record keeping and as to Buick's fiscal year. Hence, we cannot tell if Buick's books and records would have reflected monthly or year-end figures through June 1972, or calendar year figures through December 1971, or figures through any other intermediate date.

**1094** ■

by an action under § 301 of the Act. 29 U.S.C. § 185.[15]

■ We have been shown no authority where during the term of a collective bargaining agreement, modifications of that agreement's contractual provisions have been permitted as a result of a pre-contract *Truitt* violation. § 301 applies to actions for the violation of contracts. An unfair labor practice does not necessarily result in a contract violation which would invoke the jurisdiction of federal courts pursuant to § 301, cf. Adams v. Budd Co., 349 F.2d 368 (3d Cir. 1965); Proctor & Gamble Independent Union v. Proctor & Gamble Manufacturing Co., 312 F.2d 181 (2d Cir. 1962, cert. denied, 374 U.S. 830, 83 S. Ct. 1872, 10 L.Ed.2d 1053 (1963), especially where, as here, no necessary or sufficient connection is shown between the unfair labor practice and the contract.[16] Moreover, nowhere has it been claimed that the Union has sought to modify the present contract, or wage or benefit provisions any time after the execution of the contract on March 13, 1973.

### B. *Union Administration*

■ The record is also silent with respect to the Union's needs for such financial information in order to "administer" the collective bargaining agreement. We realize that a union is entitled to information necessary to prosecute grievances, NLRB v. Acme Indus. Co., *supra,* but there is no showing that the information requested has any present or future relevance to such a situation. Indeed, we are not aware of any grievances past or present pending under the present contract provisions. There is no indication that the Union's obligation to "administer" the collective bargaining agreement might be affected by the information sought. *See* International Tel. & Tel. Corp. v. NLRB, 382 F.2d at 371–372. The predictions of the Board as to how such information may be employed by the Union are mere speculation. As such, no demonstration of relevance has been shown. Absent such a showing, we cannot say that present enforcement of the Board's financial disclosure order would achieve ends "fairly said to effectuate the policies of the Act." *See* NLRB v. Kingston Cake Co., 206 F.2d 604, 611 (3d Cir. 1953).

15. 29 U.S.C. § 185 in pertinent part provides:
(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

16. In this regard, we note that suits for the breach of a bargaining representative's duty of fair representation may be brought under section 301(a) only if a sufficient connection is shown between the contract and the breach. *See* Leskiw v. Local 1470, IBEW, 464 F.2d 721 (3d Cir.), cert. denied, 409 U.S. 1041, 93 S.Ct. 526, 34 L.Ed.2d 490 (1972); International Longshoremen's & Warehousemen's Union v. Kuntz, 334 F.2d 165 (9th Cir. 1964).
The cases to which the Board refers us do not support the Board's contention that the

Union may seek modification of the existing contract. An analysis of Mearns v. Lewis, 168 F.Supp. 134 (N.D.W.Va.1958), aff'd 268 F.2d 427 (4th Cir. 1959) and Local Union No. 600, United Auto Aircraft & Agricultural Implement Workers of America, UAW-CIO v. Ford Motor Co., 113 F.Supp. 834 (E.D. Mich.1953) reveals that both cases involved attempts to rescind collective bargaining agreements on the basis that *fraudulent* representations were used to *induce* one of the parties to execute the particular agreement. Absent affirmative showings that the challenged contracts were the result of fraudulent representations, the courts in each case rejected the party's contentions and upheld the contractual provisions although implicitly recognizing the viability of such a doctrine. Here, there is no claim, nor would the record support such a claim of fraudulent inducement. We do not equate the *Truitt* conduct of Buick (after which the agreement was executed) with fraudulent activities designed to induce a party to enter into a contract.

## C. *During Term of Contract*

Although the record discloses no pending grievances or issues, it is conceivable that under the existing agreement a problem may arise in a context where Buick's financial information may become relevant. We cannot know at this time: (a) whether Buick will plead economic inability;[17] (b) whether if such plea is made, Buick will then refuse disclosure of its substantiating data; (c) whether under the circumstances then existing Buick's conduct would constitute an unfair labor practice; (d) whether the records which are subject to the Board's September 17, 1973 order (i. e., pre-July 1972 records) and the only records with which we are concerned here, would have any relevance whatsoever to the particular issue then disputed; and (e) whether the collective bargaining provisions of the existing contract would have any effect on the dispute. The mere cataloging of the myriad issues to be faced, as to which neither of the parties can have knowledge at this time, fortifies our view that the enforcement of the Board's order would be inappropriate. We cannot anticipate from Buick's past conduct that it will take unlawful action in the future, nor will we grant enforcement of an order to restrain the possible future commission of a new violation unrelated to that with which Buick was here charged. *See* NLRB v. Express Publishing Co., 312 U.S. 426, 435–437, 61 S.Ct. 693, 85 L.Ed. 930 (1941).

In light of this discussion, we refrain from comment on the potential application of the *Truitt* doctrine to any viable issue that might arise during the course of the present agreement.[18] It is sufficient for our purposes here to recognize that the record is deficient, both with respect to the relevance of a *Truitt* violation during the term of the contract, and the relevancy of pre-July 1972 financial information to an issue which has not now and may never arise.

## D. *Termination of Contract*

The collective bargaining agreement executed on March 13, 1973 does not expire by its terms until March 1976. We cannot know now whether Buick will claim inability to meet Union demands when and if a renewal of that contract is negotiated. We do not and cannot know from this record whether Buick if asked for financial data, will refuse to furnish such information. "Thus, while the board's discretion in ordering affirmative action is wide and should not lightly be disturbed, it has its limits. Certainly, a court of appeals has some responsibility for the effects of its own decree . . . ." NLRB v. Kingston Cake Co., 206 F.2d at 611. We cannot, consistent with our equitable role, defer to the Board's discretion in ordering affirmative action by Buick without knowing the context within which a subsequent violation might arise—or if indeed a subsequent violation will ever occur. (See our discussion under Part, V.C., *supra*). As a court of equity, we will not engage in such a vain endeavor.[19]

---

17. *But cf.* General Elec. Co. v. NLRB, 466 F.2d 1177, 1184 (6th Cir. 1972).

18. We recognize that the Board is not precluded by the grievance and arbitration provisions of the existing collective bargaining agreement from finding that Buick violated its statutory duty to bargain in good faith under section 8(a)(5) and (1) by refusing to furnish the Union with relevant financial data. *See* NLRB v. Acme Indus. Co., 385 U.S. 432, 437–438, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967). The Board is not required to await an arbitrator's determination of the relevancy of information requested by the Union before seeking to enforce the statutory duty to bargain in good faith. *Acme, supra.* Nor do we hold that a directive to Buick to furnish relevant financial information must necessarily arise through the grievance and arbitration procedures. *See Curtiss-Wright*, 347 F.2d at 71; *cf.* NLRB v. Strong, 393 U.S. 357, 360–361, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969); NLRB v. C & C Plywood Corp., 385 U.S. 421, 428–429, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967).

19. In this connection we are mindful of the caution expressed by the Supreme Court:

"We do not hold, however, that in every case in which economic inability is raised as an argument against increased wages it

**1096**

## VI.

We are fully cognizant of those cases in which orders have been enforced after a change in circumstances. *See, e. g.,* NLRB v. Raytheon Co., 398 U.S. 25, 90 S.Ct. 1547, 26 L.Ed.2d 21 (1970); NLRB v. Electric Steam Radiator Corp., 321 F.2d 733 (6th Cir. 1963) (enforcement of order despite the employer having discontinued operations and having gone out of business). But an examination of those cases reveal that in each instance the Board's order provided a "cease-and-desist" sanction which would subject the employer to contempt proceedings if the acts constituting the unfair labor practice were to be resumed. Here, there is no such proposed cease-and-desist sanction in the Board's remedial order as its respects the production of financial information. As the Board recognizes in its supplemental brief, its order would not subject Buick to contempt proceedings with respect to future collective bargaining conduct. Thus, the Board recognizes, as do we, that under certain limited circumstances a violation of the Act may go unpunished. Our objective, however, is to effectuate the policies of the Act,[20] and not necessarily to impose punitive sanctions where the "punishment" may not be relevant to correct the violation committed.

We emphasize again that our refusal to enforce the Board's order is prompted by the dilution in relevancy occasioned by the passage of time and the execution of the present collective bargaining agreement. In respect to remedial orders for *Truitt* violations, it is our view that to effectuate the policies of the Act, the information to be furnished by the employer must have current relevancy both to the Union in the proper performance of its functions and to the issues involved.[21] We consider the execution of the new agreement under the circumstances then existing, to be but one factor in establishing the relevance of the information to be supplied to the Union for carrying out its functions.

Accordingly, so much of the Board's order as requires the disclosure of Buick's financial data will be set aside and enforcement as to that portion of the September 17, 1973 order will be denied. Enforcement will be ordered as to the remainder of the Board's order. Each party shall bear its own costs.

---

automatically follows that the employees are entitled to substantiating evidence. Each case must turn upon its particular facts. The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met."
NLRB v. Truitt Mfg. Co., 351 U.S. at 153–154, 76 S.Ct. at 756 (footnotes omitted).

Counsel were asked to prepare and submit in their supplemental briefs the form of an order which if enforced would accomplish this quoted principle. No such submission was received. It may be that the Board attempted to resolve the issue of present and future application of its order by limiting the scope of records to be furnished. *See* p. 1093 Part, V. A., *supra.*

20. As we analyze the Board's disclosure order and the affirmative action which it would impose upon Buick, we fail to discern how enforcement of that order at this time can effectuate any policy of the Act. *See* Virginia Electric Co. v. NLRB, 319 U.S. 533, 539–540, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943).

21. We do not imply here that by entering into a collective bargaining agreement subsequent to the *Truitt* violation, the Union waived its right to receive the information requested. Such waiver cannot be lightly inferred, but must be clearly and unmistakably established before it can be relied upon as a bar to recovery. Radio Television Tech. School, Inc. v. NLRB, 488 F.2d 457, 461 (3d Cir. 1973); Timken Roller Bearing Co. v. NLRB, 325 F.2d 746 (6th Cir. 1963), cert. denied, 376 U.S. 971, 84 S.Ct. 1135, 12 L. Ed.2d 85 (1964).