**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NEWBERRY EQUIPMENT COMPANY, Inc., Respondent.**

No. 18991.

United States Court of Appeals
Eighth Circuit.

Sept. 19, 1968.

Allen J. Berk, Attorney, N.L.R.B., Washington, D. C., for petitioner; Arnold Ordman, General Counsel, N.L.R.B., Dominick L. Manoli, Associate General Counsel, N.L.R.B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., and Herman M. Levy, Attorney, N.L.R.B., Washington, D. C., on the brief.

Donald R. Wellford, of McCloy, Wellford & Clark, Memphis, Tenn., for respondent.

Before VAN OOSTERHOUT, Chief Judge, BLACKMUN, Circuit Judge, and VAN PELT, District Judge.

BLACKMUN, Circuit Judge.

The National Labor Relations Board seeks enforcement of its three-member panel order issued April 7, 1966, directed to Newberry Equipment Company, Inc. 157 NLRB 1527. The Board adopted, with stated modifications, its trial examiner's findings and conclusions that Newberry had violated § 8(a) (5) and (1) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(a) (5) and (1). Specifically, it found that Newberry indulged in bad faith bargaining with the union and took certain unilateral actions without notification to or consultation with the union.[1] The labor organization concerned is The International Union, District 50, United Mine Workers of America.

Newberry is engaged in the manufacture, sale and distribution of tanks, steel forms and fabricated metal products. The claimed unfair labor practices took place at Newberry's plant at West Memphis, Arkansas. Jurisdiction under § 10(e), 29 U.S.C. § 160(e), is established. The company has been confronted with unfair labor practice charges before. See 135 NLRB 747 (1962).

The basic issue is the sufficiency of the evidence to support the Board's findings.

On June 11, 1964, following a representation election, the union was certified by the Board as the exclusive bargaining representative of Newberry's production and maintenance employees. Thereupon the union and the company entered into contract negotiations. They met 13 times before the filing of the unfair labor practice charge on December 4, 1964. These meetings took place June 22 and 25, July 8 and 30, August 12, September 3 and 21, October 5 and 9, and November 4, 6, 17 and 24. They also met on December 8. No minutes were kept.

At the first four meetings the chief negotiator for the union was Franklin V. Wright, its international representative. Beginning with the fifth meeting the union's chief negotiator was its regional director, C. W. McColeman, of Birmingham. McColeman, however, was not present at the last three meetings.

At the first five meetings Vice President R. J. Hopkins was the negotiator for the employer. At the next four meetings the company was represented by President J. M. Newberry and Hopkins. At the last five meetings Newberry alone was present for the company.

During the first five sessions the parties reached what both sides describe as "tentative agreements" on a number of subjects. Hopkins testified that he assumed the active day-to-day management of the company from October 1962 to October 1964 and that he "had full authority to negotiate with the union and

---

[1.] The Board refused to adopt the trial examiner's findings that Newberry had violated § 8(a) (5) by other acts, claimed to be unilateral, relating to vacations and to wages of newly hired employees.

to enter agreements in the course of such negotiations". The trial examiner accepted Wright's testimony that, at the sixth meeting, on September 3, 1964, Newberry declared that "What Mr. Hopkins agreed on was not necessarily what I would agree on" and "whatever we agree on today may not be all right next week". On September 4, the day following Newberry's initial appearance at the negotiating sessions, Hopkins wrote a letter to McColeman. This recited that it was "a recap of contract negotiation meetings which have been held * * *." It went on to state:

"At the opening of the meeting I made statement that any portions of the proposed contract that were agreed upon by the company representatives were to be understood as tentative agreements, until such time as the contract in its entirety was agreed upon, and that any tentative agreement was subject to retraction, alteration, or other change during the course of contract negotiations. I also made the statement that any agreements made by company representatives were subject to approval by the company Board of Directors. Mr. Wright also stated that agreements on the part of the Union were tentative until the contract in its entirety had been agreed upon, and that any and all agreements by the Union were subject to approval by the plant's union membership and subject to ratification by the International Office of United Mine Workers of America."

With this general background, we turn to the bad faith bargaining and unilateral actions issues.

A. *Bad Faith Bargaining.* Section 8(d) of the Act, 29 U.S.C. § 158(d), defines the collective bargaining process as "the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith * * * but such obligation does not compel either party to agree to a proposal or require the making of a concession * * *." This

court, through Judge Matthes, has commented upon § 8(d):

"The employer is under a duty to enter into sincere, good faith negotiations with the constituted representative of the employees, with an intent to settle the differences and to arrive at an agreement. Mere pretense at negotiation with a completely closed mind and without this spirit of cooperation and good faith does not satisfy the requirements of the Act. * * * The parties are required to deal with each other with an open and fair mind and sincerely endeavor to overcome obstacles or differences existing between them. * * *" NLRB v. Wonder State Mfg. Co., 344 F.2d 210, 215 (8 Cir. 1965).

The Board in its brief here acknowledges that "[r]esolution of the question of good faith necessarily involves consideration of all the facts of a particular case * * *." It cites NLRB v. Insurance Agents' International Union, 361 U.S. 477, 498–499, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). See also NLRB v. American Nat. Ins. Co., 343 U.S. 395, 410, 72 S.Ct. 824, 96 L.Ed. 1027 (1952).

The Board then argues, to support its findings that the company negotiated in bad faith, that: (1) Until the appearance of President Newberry at the bargaining table, "negotiations had proceeded smoothly and agreements were reached on many terms of a future contract". (2) When Newberry "intervened" at the sixth meeting, he announced that anything agreed to by Hopkins could be thrown out, and the bargaining table was thereby swept clean. (3) The company reaffirmed various agreements only to repudiate them at subsequent sessions with statements which suggested mere superficial bargaining. (4) Newberry went so far as to insist upon a clause denying the union and the employees the right to file unfair labor practice charges and to preclude them from testifying. (5) Newberry refused to admit that he was aware of a proposal submitted by

McColeman relative to settlement of disputes. (6) Newberry constantly changed conditions for the reemployment of employee Gant, who was a member of the negotiating committee and who had been discharged because of a garnishment for an unpaid hospital bill. (7) Newberry rejected the union's suggestion that the Federal Mediation and Conciliation Service be called in to assist. (8) Newberry refused to spend more time in negotiations.

We, however, do not so read the record. We feel, instead, that the required fair reading of the record reveals that it is not supportive of the Board's position. We emphasize the following:

1. The union was certified June 11, 1964. The first bargaining session was eleven days later, on June 22. Following this there was at least one meeting every calendar month. There was never as much as a month between meetings. There was no long delay between sessions, no indefinite postponement, no refusal to attend, and no nonappearance factors which appear in many of the refusal-to-bargain cases. This is not unreasonable continuity and it is to be contrasted with the repeated postponements and unpreparedness present and relied upon in our case of NLRB v. Southern Transport, Inc., 343 F.2d 558, 560 (8 Cir. 1965).

2. To the extent that the parties' stipulation reveals time spent, these bargaining sessions lasted two or three hours. At only one, that of October 9, did a company representative, in this case Newberry, suggest that he was compelled to be elsewhere (McColeman testified that Newberry "received a telephone call shortly after he came into the meeting and he said it was urgent, that he had to leave early."); even then the meeting lasted almost two hours.

3. It is true that the company "changed horses" when Newberry assumed the chair of chief company negotiator at the sixth session on September 3. But this cannot be characterized as a delaying tactic for two convincing reasons. The first is that the union had done precisely the same thing at the immediately preceding session when McColeman took over ahead of Wright. The second is that the company was suffering a financially adverse third quarter and Newberry returned to executive leadership in order to try to right the situation.

4. Hopkins' letter of September 4, purporting to be a recapitulation of the sessions which had taken place up to that date, was naturally called for. No formal minutes or record of the sessions had been kept. Newberry, after an absence, had come into the meetings just the day before and McColeman had appeared within the month. The letter was not an intra-office company memorandum but a communication directed to McColeman. It was written at a time when no unfair labor practice charge was pending. The union did not dispute the recitals of the letter when it was received.

5. This letter, and the negotiations themselves, as the testimony indicates, consistently characterized the advancing understandings of the parties as only "tentative agreements", that is, tentative until the contract in its entirety was agreed upon, tentative in that they were subject to retraction and change as the sessions went on, and tentative in that all was subject to approval by the company's board and, on the union's part, as Wright himself testified, by its membership and its international office. Anyone familiar with labor negotiations knows the practical realities of membership approval. Of course, technical rules of contract law are not to serve as a measure of good or bad faith in collective bargaining. Lozano Enterprises v. NLRB, 327 F.2d 814, 818 (9 Cir. 1964). But tentativeness, as such, is no indication of bad faith. It is, instead, to paraphrase Mr. Justice Cardozo's comment in Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933), a way of life in the labor field.

6. Wright conceded on cross-examination that bargaining even then was still

proceeding on wages and that this issue and other items remained open. The record indicates that the union had not submitted its proposal on wages at any time during the first 14 sessions. The situation was not an easy one for either side. The company was having its economic problems and the union, naturally, wished to hold all its past gains and to accomplish others.

7. Newberry was not a lawyer. According to his testimony, he was a man of limited education and had completed only the seventh grade. We see no nefariousness in his suggestion that a clause be inserted which would deny established labor rights to the employees. The union and the Board well know the precarious legal effect of any such clause. The suggestion obviously was made in ignorance.

■ 8. The parties did not cease negotiating with the session of December 8, 1964.[2] We recognize, of course, that compliance, in itself, is not a defense to an unfair labor practice charge or a bar to the enforcement of a Board order. NLRB v. Mexia Textile Mills, Inc., 339 U.S. 563, 567, 70 S.Ct. 826, 833 94 L.Ed. 1067 (1950); NLRB v. Decker, 296 F.2d 338, 342 (8 Cir. 1961).

While it is ordinarily difficult to evaluate and effectively to compare fact determinations in decided cases, the decisions cited by the Board as authority for its conclusion of bad faith bargaining here are, we feel, clearly distinguishable factually in important respects: In San Antonio Machine & Supply Co. v. NLRB, 363 F.2d 633, 639, 641 (5 Cir. 1966), there were withdrawals by the company "from areas of prior actual agreement", and marked changes constituting a "reversal of position" in the company's own proposals on seniority. In Lozano Enterprises v. NLRB, supra, 327 F.2d 814, a complete tentative agreement was reached; this was revised and then sign-

ed by the company's president but retained, until after the certification year expired, by its labor consultant, with a misrepresentation on his part to the union that the agreement had not been signed. In NLRB v. International Furniture Co., 212 F.2d 431 (5 Cir. 1954), the employer repeatedly withdrew its own proposals and its agreement to some demands made by the union, failed to appear on an agreed meeting date, and instituted, shortly after the expiration of the certification year and without notice, a system of paid holidays and wage increases, and its attorney stated "the union would be five years getting a contract". In NLRB v. National Shoes, Inc., 208 F.2d 688 (2 Cir. 1953), bargaining "was leisurely maintained", "items already settled" were re-opened, there were unaccounted-for delays and postponement of meetings by the employers "for weeks at a time".

■ Thus, while a determination of good faith bargaining by Newberry relates to its state of mind and is a resolution of a question of fact, NLRB v. National Shoes, Inc., supra, pp. 691–692 of 208 F.2d, we conclude that, considering this record as a whole and having in mind the teachings of Universal Camera Corp. v. NLRB, 340 U.S. 474, 487–488, 71 S.Ct. 456, 95 L.Ed. 456 (1951), we cannot conscientiously find that the evidence supporting the Board's decision on the bargaining issue is substantial.

B. *Unilateral actions.* The complaint alleged, and the examiner and the Board found, that the company committed unfair labor practices, in violation of § 8(a)(5), in unilaterally deciding (1) on November 17 to cease, effective one week later, the payment of premiums on its life and medical insurance plan for employees; (2) on November 24 to cease, effective one week later, the grant to employees of five paid holidays a year; and (3) on December 8 to cease, effective about that date, deducting and remit-

2. The record and briefs indicate that the parties were still bargaining at the time of the hearing before the trial examiner, that they reached agreement and executed a contract about June 6, 1966, and that that agreement expired in due course and still another, currently in effect and expiring June 30, 1969, was negotiated.

ting premiums on a guaranteed salary insurance policy participated in by five employees.

The evidence cited by the trial examiner as supporting the Board's decision on this issue is that of union witness Wright on his direct examination, and Newberry's written notifications of these changes given to Wright.

■ It is established, of course, that, wholly apart from a finding of bad faith, an employer's unilateral change in conditions of employment which are under negotiation is a violation of § 8(a) (5). This is because such action is legally tantamount to a refusal to bargain. NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962) ; NLRB v. Frontier Homes Corp., 371 F.2d 974, 979 (8 Cir. 1967).

If Wright's testimony consisted only of what he said on direct examination, the result reached by the trial examiner, inasmuch as he credited Wright's testimony, might well be controlling here. But if Wright's testimony is to be credited, one must also look at what the witness said on cross-examination.

■ On cross Wright conceded that Newberry gave him an explanation as to why Newberry felt the company would have to withdraw benefits; that the explanation was that the company was losing money; that this reason was presented "at the meeting right before he gave me the memos that he had done away with the insurance and paid holidays"; that Newberry asked Wright whether he wanted to see the books; that Wright declined for "I am no auditor"; that he recalled McColeman's asking whether Newberry would object to having the union's auditor examine the books; that Newberry's reply was that he had no objection; that Wright expressed no doubt to Newberry about the company's sustaining financial losses; that Wright expressed no objection to Newberry's proposals other than that "the employees was going to be very unhappy over this"; that the company's proposals to make the changes were "discussed before, the meeting before that he give me the memos"; that Newberry advised him at that time that administrative and executive salaries had been cut from 10 to 50%; that Newberry stated that the proposed withdrawal of benefits was not permanent and the company would be willing to reinstate them as soon as it was in a financial position to do so; and that Wright had an opportunity to express himself with respect to the company's proposal to reduce benefits.

We add, for what color it may provide, that Wright also testified on cross-examination that the union did not submit any proposal on wages during the first 14 meetings; that the company never refused to submit proposals or counter-proposals; that the union submitted counter-proposals; that no agreement had been reached with respect to check-off; that in discussing profits the union indicated that, without an agreement on checkoff, there could be no contract; and that before agreement was reached, wage increases for three persons were suggested to the union by the company, were not opposed, and were placed in effect. Like tactics, it seems to us, were thus employed by each side.

■ The testimony of witness Wright, as we have noted, must be viewed in its entirety and, if he is to be credited with respect to what he stated on direct examination, his testimony on cross-examination is also to be fairly credited. This certainly is the implication flowing from Universal Cameras' emphasis "on the record considered as a whole." But when Wright's cross-examination is reviewed, it is apparent from the mouth of this only witness on which the trial examiner relied, that Newberry did give notice to Wright of the proposed changes; that Wright did have the opportunity to express himself with respect to them; that the company's reason, namely, its economic situation, was transmitted with an expression of willingness to have the books examined; and that the company's action was across the board and not limited to union members.

Wright's testimony simply does not add up to a showing of unilateral changes in conditions of employment and it does not demonstrate a violation of § 8(a) (5).

These conclusions make it unnecessary to discuss the parties' respective contentions as to remedy.

Sometimes we wonder whether a little more patience, a little more care in bargaining remarks, and a little less trigger-happy attitude on both sides would not lead to settlements and the avoidance of unfair labor practice charges, to the benefit of all concerned.

Enforcement denied.