GALLOWAY TOWNSHIP BOARD OF EDUCATION, RESPON-
DENT-RESPONDENT, v. GALLOWAY TOWNSHIP EDU-
CATION ASSOCIATION, CHARGING PARTY-APPEL-
LANT.

Argued March 7, 1978—Decided August 1, 1978.

Mr. *James M. Blaney* argued the cause for appellant (*Messrs. Starkey, White and Kelly,* attorneys).

Mr. *Sidney H. Lehmann,* General Counsel, argued the cause for appellant Public Employment Relations Commission (*Mr. Lehmann* and *Mr. Don Horowitz,* Deputy General Counsel, on the brief).

Mr. *James P. Granello* argued the cause for respondent (*Messrs. Murray, Meagher and Granello,* attorneys; *Mr. Robert J. Hrebek,* on the brief).

*Messrs. Ruhlman and Butrym* submitted a brief on behalf of *amicus curiae* New Jersey Education Association (*Mr. Cassel R. Ruhlman, Jr.,* on the brief).

*Messrs. Pellettieri and Rabstein* submitted a brief on behalf of *amicus curiae* New Jersey State AFL-CIO (*Mr. Ira C. Miller,* on the brief).

The opinion of the court was delivered by

PASHMAN, J. Two significant questions concerning proceedings before the Public Employment Relations Commission (PERC) involving unfair practices as defined in the New Jersey Employer-Employee Relations Act (the Act), *L.* 1968, *c. 303,* as amended by *L.* 1974, *c. 123, N. J. S. A.* 34:13A–1 *et seq.,* are presented by this appeal. One concerns the effect of the cessation of conduct alleged to be violative of the Act on PERC's ability to adjudicate an unfair practice and to have its remedial order enforced. The other involves the lawfulness of a public employer's unilateral withholding of a scheduled salary increment.

The Galloway Township Education Association (the Association), the majority representative of the teachers employed by the Galloway Township Board of Education (the Board), filed an unfair practice charge against the Board with PERC in September 1975. *See N. J. S. A.* 34:13A–5.4(c) ; *N. J. A. C.* 19:14–1.1 *et seq.* The primary basis of the charge was the Board's alleged refusal to negotiate in good faith in violation of *N. J. S. A.* 34:13A–5.4(a) (5) by having unilaterally determined to withhold the payment of the annual salary increment due the teachers represented by the Association. At the time of the filing of the charge, the Association and the Board were engaged in negotiations directed toward the consummation of a collective agreement to cover the 1975-1976 school year. Their previous contract had expired on June 30, 1975. The parties had submitted to the impasse resolution procedures set forth in the Act, *N. J. S. A.* 34:13A–6(b), and completed

the mediation phase thereof; they were scheduled to enter the fact-finding phase of those procedures. However, upon the start of the 1975-1976 school year without agreement upon a contract, the Board decided to refrain from paying the teachers the salary step increment they would normally have received at the start of a new school year to reflect an additional year of teaching experience.[1] Instead, the Board determined to pay the teachers the same salary they had received during the previous school year. These decisions were made unilaterally by the Board without negotiation with the Association on the issue.

On November 10, 1975, PERC issued a formal unfair practice Complaint and Notice of Hearing. *See N. J. S. A.* 34:13A–5.4(c); *N. J. A. C.* 19:14–2.1. Thereafter the Association and the Board entered into a complete stipulation of facts. They waived an evidentiary hearing and an intermediate hearing examiner's report and agreed to submit the matter directly to PERC for a decision on the pleadings, stipulated facts and briefs on the issue of whether the Board's unilateral withholding of the increments constituted a violation of the Act. *See N. J. A. C.* 19:14–6.7.

On April 13, 1976 counsel for the Board submitted a letter to PERC advising it that the parties had reached a tentative settlement on a new collective agreement for the 1975-1976 school year which would provide for the retroactive payment of salary increments based on a new salary guide. The Board therefore requested PERC to dismiss the unfair practice proceeding as moot.

PERC did not accede to this request and on April 28, 1976 issued its decision and order determining that the

---

[1] With the exception of the 1971–1972 school year, in other school years the teachers received their increments in September effective with the commencement of the new school year. In 1971–1972 the Board also withheld increments until a new agreement was reached that November. In all other years, collective agreements were in existence as of the commencement of the new school year.

Board had committed an unfair practice within the meaning of the Act and ordering the Board to (1) cease and desist from that unfair practice and to (2) take certain affirmative and remedial action. PERC No. 76–32, 2 *NJPER* 186 (1976). PERC found that the Board's conduct was violative of the statutory duty to negotiate in good faith before establishing a change in working conditions. *N. J. S. A.* 34:13A–5.3, 5.4(a) (5). PERC also determined that such unilateral action coerced the Board's employees in the exercise of the rights guaranteed them by the Act in violation of *N. J. S. A.* 34:13A–5.4(a) (1). The Board was ordered to cease and desist from:

(a) Interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed to them by the Act;
(b) Refusing to negotiate collectively in good faith with the Association concerning the terms and conditions of employment of the teachers;
(c) Unilaterally altering, or threatening to unilaterally alter, terms and conditions of employment of its teachers during the course of collective negotiations with the Association.

PERC directed the Board to take the following affirmative action, which it determined to be necessary to effectuate the policies of the Act:

(a) Upon request, negotiate collectively in good faith with the Association concerning the terms and conditions of employment of its teachers;
(b) During the course of collective negotiations with the Association, pay its teachers [the withheld] increments pursuant to the 1974–1975 salary schedule;
(c) Pay its teachers the monetary difference between the amounts they would have received had their increments not been unilaterally withheld, and the amounts they were in fact paid since the commencement of the 1975–1976 school year;
(d) Post at its central office building copies of a notice to employees prescribed by PERC for 60 days;
(e) Notify PERC of its steps taken to comply with the PERC order.

The Board filed a notice of appeal from PERC's decision and order to the Appellate Division. PERC thereafter filed

a cross-application for enforcement of its order pursuant to *N. J. S. A.* 34:13A–5.4(f). Subsequent to the institution of those appellate proceedings, PERC determined that the new collective agreement had been ratified by both parties and that the withheld increments had been paid to the teachers. PERC therefore advised the Appellate Division of these facts and of its administrative determination that the portion of its order calling for the payment of the withheld increments had been satisfied by the Board. PERC accordingly requested withdrawal of those aspects of the cross-application for enforcement which sought a court decree directing that the withheld increments be paid and that the Board negotiate with the Association. However PERC still sought enforcement of the cease and desist portions of its order and also that portion requiring the Board to post a notice to all employees indicating its willingness to abide by the Act and to comply with PERC's decision in the future.

In its decision, the Appellate Division never reached the merits of the unfair practice issue. 149 *N. J. Super.* 352 (App. Div. 1977). In its brief unanimous opinion the appeals court held that the successful negotiation of a new collective agreement between the parties rendered the entire matter moot. It consequently ruled that PERC had exceeded its statutory authority by making an adjudication in the unfair practice proceeding after the agreement had been consummated. The court noted its agreement with the Board's contention that PERC should have declined to make a ruling in the case and dismissed the unfair practice complaint based on a refusal to negotiate "'by reason of a voluntary negotiated agreement between the parties.'" 149 *N. J. Super.* at 354. The court reversed PERC's decision and directed PERC to vacate its order.

Both PERC and the Association unsuccessfully sought a rehearing before the Appellate Division. Petitions for certification filed by those parties were granted by this Court. 75 *N. J.* 29 (1977). We permitted the New Jersey State

AFL-CIO and the New Jersey Education Association to file briefs as *amici curiae.*

PERC requests this Court to enforce those aspects of its remedial order which it continued to press in its cross-application before the Appellate Division. PERC withdrew the portions of the order which mandated payment of the withheld increment and collective negotiation with the Association. Thus, enforcement is sought only of the cease and desist orders and the order to post notices which were not abandoned below.

I

A preliminary matter to be considered is the propriety of PERC's participation as an advocate in appellate proceedings considering the enforcement of one of its orders. We view the Appellate Division's concern with this issue to be unfounded in light of the statutory structuring of PERC's role in unfair practice proceedings.

PERC is an administrative agency with regulatory powers. *N. J. S. A.* 34:13A–5.2. It is given certain statutory powers to fulfill its delegated duty as a regulatory body in the field of public employment labor relations. These include legislation (*i. e.,* rule making), investigation, prosecution and adjudication.

The 1974 amendments to the Act, *L.* 1974, *c.* 123, entrusted PERC with exclusive jurisdiction over unfair practice proceedings as therein defined. *N. J. S. A.* 34:13A–5.4(c) ; *Patrolmen's Benevolent Ass'n v. Montclair,* 70 *N. J.* 130, 136 (1976) ; *see* also *N. J. A. C.* 19:10–1.1(a) (26). This jurisdiction was conferred in response to this Court's determination in *Burlington Cty. Evergreen Park Mental Hospital v. Cooper,* 56 *N. J.* 579 (1970), that PERC lacked the power to adjudicate or remedy unfair labor practices under the original Act, *L.* 1968, *c.* 303. *See* 56 *N. J.* at 598–599. Under *N. J. S. A.* 34:13A–5.4(c), upon the filing of a charge that a party is engaging in unfair practices in

violation of *N. J. S. A.* 34:13A–5.4(a) or (b), PERC is given the authority to issue an unfair practice complaint against the party named in the charge. The determination of whether a charge is sufficiently meritorious to warrant the issuance of a complaint is made by PERC's Director of Unfair Practices. *See N. J. A. C.* 19:14–2.1; *N. J. A. C.* 19:10–1.1(a) (11). Any unfair practice complaint issued includes a notice of hearing containing the date and place of a hearing on the unfair practice complaint before PERC.[2] *N. J. S. A.* 34:13A–5.4(c). To this point, PERC's role has been of a prosecutorial nature.

However, this role changes as the unfair practice proceeding progresses. *N. J. S. A.* 34:13A–5.4(c) directs that all cases in which an unfair practice complaint has issued "shall be prosecuted before [PERC] * * * by the representative of the employee organization or party filing the charge or his authorized representative." Consistent with the statutory mandate, PERC's regulations state that "the charging party * * * shall prosecute the case and shall have the burden of proving the allegations of the complaint by a preponderance of the evidence." *N. J. A. C.* 19:14–6.8. The decision as to whether the party charged in the complaint has committed an unfair practice and, if so, the determination of the appropriate remedy therefor are to be made by PERC. *N. J. S. A.* 34:13A–5.4(c). PERC's role at this stage of the unfair practice proceeding is an adjudicative one.

In the event of noncompliance with its orders issued in unfair practice cases,[3] PERC resumes a prosecutorial role. PERC has been empowered to seek the aid of the courts in compelling compliance by applying to the Appellate Division

---

[2]In the instant case, the parties waived an evidentiary hearing and submitted the case to PERC for decision on the stipulated facts.

[3]We are concerned herein only with enforcement of PERC's orders in unfair practice proceedings. However, we note that *N. J. S. A.* 34:13A–5.4(f) provides a means for enforcement of its orders made in scope-of-negotiations proceedings as well.

for an appropriate judicial decree enforcing its order. *N. J. S. A.* 34:13A–5.4(f). The Legislature has mandated that judicial review of PERC's decisions and orders shall be of a very limited scope:

* * * [PERC's] findings of fact, if based upon substantial evidence on the record as a whole, shall not, in such [enforcement] action, be set aside or modified; any order for remedial or affirmative action, if reasonably designed to effectuate the purposes of the act, shall be affirmed and enforced in such proceeding.

[*N. J. S. A.* 34:13A–5.4(f)]

The decision whether to initiate an enforcement action in a given case is entrusted to PERC's sound discretion. The statute authorizes, but does not require PERC to seek judicial assistance to enforce its orders. *See also N. J. A. C.* 19:14–10.2(b). It is noteworthy that while the party found by PERC to have committed an unfair practice may seek appellate review of PERC's decision and order pursuant to *R.* 2:2–3(a), the successful charging party may only request PERC to seek judicial enforcement of its order. *See N. J. A. C.* 19:14–10.3. The lack of any statutory authorization for the charging party to seek enforcement of PERC's orders is consistent with the legislative design that PERC's role in enforcing the public rights created by the Act is exclusive. *Cf. Amal. Utility Wkrs. v. Cons. Edison,* 309 *U. S.* 261, 265–266, 60 *S. Ct.* 561, 84 *L. Ed.* 738 (1940).

PERC is represented in this appeal, and in all judicial proceedings, by its General Counsel, appointed pursuant to *N. J. S. A.* 52:17A–13 by the Attorney General. *See N. J. A. C.* 19:10–5.1. As noted by the Appellate Division below, this is because PERC "adjudicates state. as well as other governmental employment relations" and the State, when litigating before PERC, would itself be represented by the Attorney General. In appellate enforcement proceedings under *N. J. S. A.* 34:13A–5.4(f), PERC's General Counsel acts as an advocate in urging the correctness of PERC's decision on the merits and the entitlement of its order to

enforcement. PERC's role in this regard is analogous to that of the General Counsel of the National Labor Relations Board when it seeks enforcement of its orders in unfair labor practice cases from the several federal courts of appeals. *See* 29 *U. S. C.* § 160,(e). PERC is joined in advocating affirmance and enforcement by the charging party who has prevailed before PERC at the administrative level.

Whatever judicial views might be as to the appropriateness of PERC's adversarial participation in an appellate proceeding in which its decision and order are under review, the Legislature has determined that PERC is the party at whose initiative enforcement proceedings are commenced. In light of *N. J. S. A.* 34:13A–5.4(f)'s express sanction of PERC's prosecutorial role at the enforcement stage, a court's view of the desirability of such participation is irrelevant.[4] The Legislature required PERC to bear the dual responsibilities of adjudicating violations of the unfair practice provisions of the Act and taking all steps necessary to enforce that which the Legislature has declared to be the public policy of this State in public employment labor relations. It is PERC's order as a public law enforcement agency which the appellate court enforces. It is PERC's right to make that order which the court sustains. PERC seeks enforcement of its orders on behalf of the public employees whose rights it is responsible for safeguarding.

██ Moreover, PERC need not await judicial affirmance of its decision and order before initiating an action for enforcement of its order under *N. J. S. A.* 34:13A–5.4(f). The Legislature has commanded that PERC's orders, if found to be appropriate under the applicable standard of

---

[4]It is irrelevant in this regard whether or not PERC's application for enforcement preceded the respondent's filing of a notice of appeal. We would assume that PERC automatically files a cross-application for enforcement whenever appellate review is sought of its decision and order by the party who was the unfair practice respondent before it.

review, "shall be affirmed *and* enforced" in the enforcement proceeding. *N. J. S. A.* 34:13A–5.4(f). In many cases the Appellate Division's expectation that compliance with PERC's order would follow immediately upon its affirmance will be accurate, especially in cases involving governmental officials who are sworn to uphold the law. If that occurs, any enforcement decree entered would, as a practical matter, be unnecessary. However, we cannot assume that all potential unfair practice respondents, which would include individuals and employee organizations as well as public employers, will always demonstrate such a respect for the law. Given the possibility that unnecessary and potentially harmful delay in securing compliance might result if PERC was forced to see if voluntary compliance was forthcoming after affirmance of its order, the legislative choice to provide the additional incentive of an enforcement decree whenever PERC's order merits appellate affirmance was a reasonable one. In light of the express direction to the contrary in *N. J. S. A.* 34:13A–5.4(f), appellate courts may not withhold the entry of an enforcement order on the ground that PERC has failed to demonstrate noncompliance with its affirmed order.[5]

## II

We must next consider whether an unfair practice proceeding premised upon an alleged refusal to negotiate in good faith in violation of *N. J. S. A.* 34:13A–5.4(a) (5) is mooted by the subsequent consummation of a collective agreement between the charging party and the party whose alleged unlawful conduct was the basis of the unfair practice charge. Pursuant to *N. J. S. A.* 34:13A–5.4(a) (5), public employers are prohibited from, *inter alia*

---

[5]Our rationale in resolving this point is not to be taken as an implication that there are not other occasions in which a quasi-judicial party respondent may appropriately defend its decision in an appeal therefrom. See *R.* 2:6–4(d).

[r]efusing to negotiate in good faith with a majority representative of employees in an appropriate unit, concerning terms and conditions of employees in that unit * * *.

There are two aspects to the mootness issue as presented in this case: whether the successful negotiation of a contract precludes PERC's adjudication of an unfair practice and, if not, whether it precludes the enforcement of PERC's cease and desist orders and its order to post a notice to employees.[6] The Appellate Division answered the first question in the affirmative and accordingly did not reach the second.

To reiterate the relevant chronology, the alleged unfair practice, the withholding of a scheduled salary increment, and the filing of the unfair practice charge occurred in September 1975. PERC's unfair practice complaint issued in November. The new collective agreement, providing for the retroactive payment of the withheld increments, was reached in early April 1976. PERC was so advised a few days later but nevertheless went ahead and issued its decision and order. The Appellate Division held that by reason of the negotiation of the contract, there was no unfair practice pending before PERC as of the date of its decision and order, thus rendering the issuance thereof in excess of its statutory authority.

In reaching this result, the Appellate Division failed to consider our ruling on the question of mootness in a substantially similar factual context in *Patrolmen's Benevolent Ass'n v. Montclair,* 70 *N. J.* 130 (1976). In that case the defendant municipality sought dismissal of an appeal brought by the plaintiff employee organization seeking an order compelling the municipality to negotiate with it and prohibiting the municipality from making any further unilateral changes in working conditions. The basis of the

---

[6]As to the enforceability of PERC negotiating orders in light of changed circumstances, See *Galloway Tp. Ass'n of Ed. Secretaries v. Galloway Tp. Bd. of Ed.,* 78 *N. J.* 1 (1978).

municipality's motion was the alleged mootness of the controversy as a result of the parties' consummation of a collective agreement resolving all disputed issues. We denied the motion to dismiss because

* * * there remain[ed] unresolved the propriety of the actions taken by the town * * * and available remedies if the municipality's actions were improper.

[70 N. J. at 135]

We accordingly directed that the case be transferred to PERC for "appropriate proceedings" under the newly enacted unfair practice provisions of the Act. Id., at 136.

The Appellate Division also failed to give appropriate consideration to the express language of N. J. S. A. 34:13A–5.4(c), which specifically empowers PERC to determine whether a party charged with an unfair practice "has engaged or is engaging in any such unfair practice" and directs PERC to take certain corrective action upon making that adjudication ("* * * shall * * * issue * * * an order requiring such party to cease and desist from such unfair practice * * * and to take * * * reasonable affirmative action * * *.")

■ By the use of the words "has engaged" in N. J. S. A. 34:13A–5.4(c), we discern a clear legislative intent that PERC's authority to adjudicate unfair practices should apply even where the offending conduct has ceased. We accordingly hold, as we effectively did in P. B. A. v. Montclair, supra, that PERC possesses the authority under that statute to adjudicate and remedy past violations of the Act if, in its expert discretion, it determines that course of action to be appropriate under the circumstances of the particular case.

■ Moreover, the termination of unlawful conduct by a party charged with unfair practice is similarly immaterial to the issue of the enforceability of PERC's order in an action initiated pursuant to N. J. S. A. 34:13A–5.4(f). The federal decisional law in unfair labor practice cases arising

under the Labor Management Relations Act (LMRA), 29
*U. S. C.* § 141 *et seq.,* (which we have today commended
for use, to the extent applicable, as a guide in unfair practice
cases in the public sector, *see Galloway Tp. Ass'n of Ed.
Secretaries v. Galloway Tp. Bd. of Ed.,* 78 *N. J.* 1
(1978)), cogently demonstrates the rationale for such a
rule. These cases hold generally that judicial enforcement
of the orders of the National Labor Relations Board is nor-
mally not to be denied because of mootness allegedly result-
ing from events occurring after the commission of unfair
labor practices but before decision by the appellate court in
enforcement proceedings instituted by the NLRB or, in some
cases, before decision by the NLRB itself.

The seminal decision on the question of whether subse-
quent events moot an order issued by the NLRB in an un-
fair labor practice case was *NLRB v. Pennsylvania Grey-
hound Lines, Inc.,* 303 *U. S.* 261, 58 *S. Ct.* 571, 82 *L. Ed.*
831 (1938), where the Supreme Court held that such an
order

> \* \* \* lawful when made, does not become moot because it is obeyed
> or because changing circumstances indicate that the need for it
> may be less than when made.
>
> [*Id.*, at 271, 58 *S. Ct.* at 576]

Several years later, the Court explained the basis for this
rule:

> We think it plain from the cases that the employer's compliance
> with an order of the [NLRB] does not render the cause moot, de-
> priving the [NLRB] of its opportunity to secure enforcement from
> an appropriate court. \* \* \* A[n] [NLRB] *order imposes a continuing
> obligation; and the* [NLRB] *is entitled to have the resumption of
> the unfair practice barred by an enforcement decree.* As the Court
> of Appeals for the Second Circuit remarked, "no more is involved
> than whether what the law has already condemned, the court shall
> forbid; and the fact that its judgment adds to existing sanctions
> that of punishment for contempt is not a circumstance to which a
> court will ordinarily lend a friendly ear." [*NLRB v. General Motors
> Corp.,* 179 *F.* 2d 221, 222 (2 Cir. 1950)] *The Act does not require*

*the* [NLRB] *to play hide and seek with those guilty of unfair labor practices.*

> [NLRB v. Mexia Textile Mills, Inc., 339 U. S. 563, 567–68, 70 S. Ct. 826, 828–29, 94 L. Ed. 1067 (1950) (emphasis added)]

The Court more recently has reaffirmed its adherence to the holdings of its earlier cases. In response to the contention that an employer's compliance with an NLRB order to refrain from interfering in a representation election proceeding and the union's subsequent election loss mooted judicial enforcement of the original NLRB order, the Court, citing *Mexia Textile* as controlling, observed:

The Act, however, is not designed merely to protect a particular election or organizational compaign. It is designed to protect employees in the exercise of their organizational rights, and that protection cannot be affected merely because a particular labor organization has chosen an immediate election rerun rather than to await enforcement of the Board order.

> [NLRB v. Raytheon Co., 398 U. S. 25, 27, 90 S. Ct. 1547, 1549, 26 L. Ed. 2d 21 (1970)]

The Court went on to hold:

Undoubtedly * * * there are situations where an enforcement proceeding will become moot because a party can establish that "there is no reasonable expectation that the wrong will be repeated." [U. S. v. W. T. Grant Co., 345 U. S. 629, 633, 73 S. Ct. 894, 97 L. Ed. 1303 (1953)] But this is not such a case. *Nothing in the record here shows that the specific acts complained of have not been repeated or gives any assurance that they will not be repeated in the future.*

The [NLRB], established by Congress with primary responsibility for the protection of the public interest in this area * * * has determined that the company. has engaged in illegal activities and that a remedial order is called for. *Under these circumstances, the employees cannot be denied the protection of the order (with the possible sanction of contempt proceedings for violations) in the absence of a decision on the merits.* "If the [NLRB's] order is justified, it is entitled to have it enforced as a means of insuring that in future elections the conduct may not be repeated."

> [Id., at 27–28, 90 S. Ct. at 1549 (emphasis added and citations omitted)]

*Raytheon* thus narrowed the circumstances in which enforcement of an NLRB order may be denied on mootness grounds to those cases where there is no reasonable likelihood for recurrence of the unlawful conduct. In doing so the Court relied upon its decision in *U. S. v. W. T. Grant Co.,* 345 *U. S.* 629, 73 *S. Ct.* 894, 97 *L. Ed.* 1303 (1953), where, in the antitrust context, it had held:

> * * * Voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i. e.,* does not make the case moot. * * * A controversy may remain to be settled in such circumstances * * *, *e. g.,* a dispute over the legality of the challenged practices. * * * The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion. * * * For to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right. * * * The courts have rightly refused to grant defendants such a powerful weapon against law enforcement.
>
> The case may nevertheless be moot if the defendant can demonstrate that "there is no reasonable expectation that the wrong will be repeated." The burden is a heavy one.
>
> [*Id.,* at 632–33, 73 *S. Ct.* at 897 (1953) (citations omitted)]

With respect to the issue of potential recurrence of the unfair labor practice, the existence of a continuing relationship between the parties enhances the appropriateness of the NLRB's decision to seek enforcement of its cease and desist orders. Such a relationship provides the opportunity and thus increases the possibility that the unlawful conduct will be repeated. *See NLRB v. Inter. Union of Operating Engineers,* 532 *F.* 2d 902, 905 (3 Cir. 1976); *C-B Buick, Inc. v. NLRB,* 506 *F.* 2d 1086, 1093 (3 Cir. 1974).

As to the precise issue here presented, that of mootness allegedly resulting from the successful negotiation of a contract, the Supreme Court has held that the question of whether such a contractual settlement will be accepted as "definitive" is for the NLRB to decide. *NLRB v. Pool Mfg. Co.,* 339 *U. S.* 577, 580–81, 70 *S. Ct.* 830,

94 *L. Ed.* 1077 (1950) citing *NLRB v. General Motors Corp.,* 179 *F.* 2d 221, 222 (2 Cir. 1950). The NLRB generally will accord dispositive effect to such private settlements and dispense with a remedial order where it, in its discretion, is satisfied that the agreement is consistent with the policies of the LMRA and fully cures the unfair labor practices and where the record of the controversy shows that there is a minimal likelihood for recurrence of the illegal conduct. *See Fetzer Broadcasting Co.,* 227 NLRB No. 185, 95 LRRM 1544 (1977); *Retail Clerks Local 322,* 226 NLRB No. 20, 94 LRRM 1012 (1976); *Bankers Club, Inc.,* 218 NLRB No. 7, 89 LRRM 1812 (1975). The NLRB has stated the reasoning underlying this administrative policy:

\* \* \* it is well-settled that an employer's execution of a contract with a union with which it had previously refused to bargain in violation of the Act does not render the issue of such violation moot. This principle is premised on the theory that the [NLRB] does not oversee the settlement of private disputes but, rather, is entrusted with the responsibility of protecting public rights under the Act. These rights are not protected, and the effects of the unfair labor practices found are not expunged, merely because of a private settlement of the dispute by the parties, which may or may not serve to remedy the adverse effect on the Section 7 [29 U. S. C. § 157] rights of the employees.

> [*Massillon Publishing Co.,* 215 NLRB No. 74, 88 LRRM 1040 (1974) (footnoted citation omitted)]

Similarly, the NLRB has stated that the execution of a contract provides

\* \* \* no assurance that the interests of the public, as distinguished from those of the charging party, will be sufficiently protected by what is essentially a private settlement agreement. In these circumstances, we do not believe it would effectuate the purposes of the Act for the [NLRB] to waive its jurisdiction in this case and

thereby deprive the public of the right of enforcement and the protection of future rights [enforcement] affords.

[*Schuylkill Metals Corp.*, 218 NLRB No. 49, 89 LRRM 1972 (1975) (citations omitted)]

The Supreme Court has approved the NLRB's approach to such cases. On the strength of *Mexia Textile, supra,* and *Pool Mfg., supra,* the Court has rejected the contention that the negotiation of a contract prior to the NLRB's decision rendered an unfair labor practice case based upon an unlawful refusal to bargain moot. *NLRB v. American National Insurance Co.,* 343 *U. S.* 395, 399 n. 4, 72 *S. Ct.* 824, 96 *L. Ed.* 1027 (1952). In another case, where a contract was reached after the filing of the unfair labor practice charge against a union for unlawful picketing but before the NLRB's issuance of an unfair labor practice complaint, the Court held that the controversy was not rendered moot, since it could not

* * * say that there was no danger of recurrent violation * * * and that the [NLRB] was not justified in concluding that, under all the circumstances, it was desirable to add the sanction of its order to whatever agreement the parties had reached.

[*Carpenters Local 1976 v. NLRB,* 357 *U. S.* 93, 97 n. 2, 78 *S. Ct.* 1011, 1015, 2 *L. Ed.* 2d 1186 (1958)]

*See C-B Buick Inc. v. NLRB,* 506 *F.* 2d 1086, 1092–93 (3 Cir. 1974); *NLRB v. Modine Mfg. Co.,* 500 *F.* 2d 914, 916 n. 2 (8 Cir. 1974); *NLRB v. Southern Household Products Co.,* 449 *F.* 2d 749, 750 (5 Cir. 1971); *NLRB v. C. & C. Plywood Corp.,* 413 *F.* 2d 112, 116 (9 Cir. 1969); *NLRB v. Seltzer,* 296 *F.* 2d 125 (2 Cir. 1961).

The rationale for this approach to the mootness question is the rule that an unfair labor practice respondent's compliance with an NLRB order is not a matter cognizable at the appellate enforcement stage of the proceeding. It is relevant only at the subsequent compliance stage before the NLRB or, in the event the NLRB seeks a contempt citation,

before the enforcing court. In *Mexia Textile, supra,* the Supreme Court suggested that "compliance with an order of the [NLRB] is irrelevant to the reviewing court's function." 339 *U. S.* at 569, 70 *S. Ct.* at 830. The Courts of Appeals have followed this suggestion:

> Only after a decree of enforcement has been entered may the issue of compliance properly be considered, either in a future proceeding before the [NLRB] or in a contempt proceeding before this court.
>
> > [*NLRB v. Ohmite Mfg. Co.,* 557 *F.* 2d 577, 579 n. 5 (7 Cir. 1977)]
>
> The precise extent to which the order can be enforced is a matter properly left for determination by the [NLRB] at the compliance proceedings which will follow this appeal.
>
> > [*NLRB v. Laborers Local 282,* 567 *F.* 2d 833, 836 (8 Cir. 1977)]

*Accord NLRB v. Marland One-Way Clutch Co., Inc.,* 520 *F.* 2d 856, 861 (7 Cir. 1975); *NLRB v. Newberry Equip. Co.,* 401 *F.* 2d 604, 608 (8 Cir. 1969); *Solo Cup Co. v. NLRB,* 332 *F.* 2d 447, 449 (4 Cir. 1964); *see also NLRB v. Autotronics, Inc.,* 432 *F.* 2d 651, 652 (8 Cir. 1970) (potential impossibility of compliance is to be considered after enforcement).

The purpose of the authorization for the NLRB to obtain judicial enforcement of its order in an unfair labor practice case in § 10(e) of the LMRA, 29 *U. S. C.* § 160(e), the federal analogue of *N. J. S. A.* 34:13A–5.4(f), was to make "* * * 'immediately available to the [NLRB] an existing court decree to serve as a basis for contempt proceedings' in the event a renewal of the unfair practice occurs after the enforcement order." *NLRB v. Mexia Textile Mills, Inc., supra,* 339 *U. S.* at 569, 70 *S. Ct.* at 830. The federal courts have recognized the salutary effect an enforcement decree will have on a party found to have committed an unfair labor practice:

> Even if the [respondent] has substantially complied with the [NLRB's] order without a judicial mandate to do so, enforcement

of the order provides an incentive for continued compliance through the possible sanction of contempt proceedings for violations.

[*NLRB v. Southern Household Products Co.,* *supra,* 449 *F.* 2d at 750]

We construe *N. J. S. A.* 34:13A–5.4(f) to have a similar purpose. The judicial enforcement of PERC's non-self-executing orders directed by that statute will serve as a pointed deterrent against resumption of the practices PERC found to be violative of the Act. There can be no guarantee that a party charged with an unfair practice, having voluntarily ceased its unlawful conduct, will not at some future time disavow its adherence to the Act's requirements. The imposition of a continuing obligation on that party to conform its conduct to law is the best means of diminishing the likelihood that it will repeat its demonstrated disdain for employee rights and statutory mandate. As we have noted, the determination of the need for an enforcement decree in a particular case is entrusted to PERC's expert discretion by *N. J. S. A.* 34:13A–5(f). See *ante* at 35.

We believe that the approach taken by the federal cases with respect to the effect of subsequent events on the issuance and enforceability of NLRB orders in unfair labor practice cases is a sound one. In view of the substantial identity between the statutory scheme of PERC's unfair practice jurisdiction and that of the NLRB under 29 *U. S. C.* §§ 158 and 160, we find in these decisions an accurate statement of the controlling legal principles concerning the enforceability of PERC's orders in unfair practice proceedings.

In the instant case, PERC determined that the Board's voluntary participation in negotiations which culminated in a collective agreement and its payment of the withheld salary increments had adequately discharged its obligations under the Act. PERC accordingly did not seek enforcement of the portions of its order requiring the Board to negotiate in good faith and to make its employees whole through payment of the increment. However, PERC evidently believed that there was a sufficient potential for recurrence

of the Board's conduct in the course of future negotiations to warrant the imposition of a continuing obligation on the Board to refrain from engaging in such practices. We defer to PERC's determination as to the need for the added deterrence against such conduct provided by judicial enforcement of its cease and desist orders if its adjudication of an unfair practice was affirmed on the merits.[7] In light of the continuing relationship between the Board and the Association, we cannot say that PERC's decision to seek enforcement constituted a mistaken exercise of its broad discretion in this area pursuant to *N. J. S. A.* 34:13A–5.4(f). The Board has failed to carry its burden of demonstrating the unreasonableness of any expectation that it might resort to similar practices proscribed by the Act in the future. We decline to speculate that the likelihood of repetition of the Board's unlawful conduct is so remote as to mandate a denial of enforcement on the ground of mootness.

## III

As a result of its disposition of the case on mootness grounds, the Appellate Division did not consider the merits of PERC's determination that the Board had engaged in unfair practices in contravention of *N. J. S. A.* 34:13A–5.4 (a) (1) and (5) by unilaterally withholding, during the course of collective negotiations, the scheduled annual salary increments for the teachers represented by the Association.[8]

---

[7]The first of the cease and desist orders, see *ante at* 31, is couched in language identical to that contained in *N. J. S. A.* 34:13A–5.4 (a)(1) and does not refer specifically to the unfair practices adjudicated. Although not at issue in this appeal, we note that as presently worded the order arguably embraces more than the particular conduct found to constitute a violation of the Act. It might be appropriate for PERC to formulate orders of this type with greater specificity.

[8]*N. J. S. A.* 34:13A–5.4(a)(1) prohibits public employers from "interfering with, restraining, or coercing employees in the exercise of the rights guaranteed to them by this Act."

█ A settled principle of private sector labor law under the LMRA is that an employer's unilateral alteration of the prevailing terms and conditions of employment during the course of collective bargaining concerning the affected conditions constitutes an unlawful refusal to bargain, since such unilateral action is a circumvention of the statutory duty to bargain. *NLRB v. Katz,* 369 *U. S.* 736, 743–47, 82 *S. Ct.* 1107, 8 *L. Ed.* 2d 230 (1962); *NLRB v. J. P. Stevens & Co., Inc., Gulistan Div.,* 538 *F.* 2d 1152, 1162 (5 Cir. 1976). "Unilateral" in this regard refers to a change in the employment conditions implemented without prior negotiation to impasse with the employee representative concerning the issue. The basis of the rule prohibiting unilateral changes by an employer during negotiations is the recognition of the importance of maintaining the then-prevailing terms and conditions of employment during this delicate period until new terms and conditions are arrived at by agreement. Unilateral changes disruptive of this *status quo* are unlawful because they frustrate the "statutory objective of establishing working conditions through bargaining." *NLRB v. Katz, supra,* 369 *U. S.* at 744, 82 *S. Ct.* at 1112.

█ Our Legislature has also recognized that the unilateral imposition of working conditions is the antithesis of its goal that the terms and conditions of public employment be established through bilateral negotiation and, to the extent possible, agreement between the public employer and the majority representative of its employees. It has incorporated a rule similar to that of *Katz* in the following provision of *N. J. S. A.* 34:13A–5.3:

Proposed new rules or modifications of existing rules governing working conditions shall be negotiated with the majority representative before they are established.[9]

---

[9]We note that by its express terms, the statutory proscription of any unilateral implementation of a change in any of the terms and

Indisputably, the amount of an employee's compensation is an important condition of his employment. If a scheduled annual step increment in an employee's salary is an "existing rul[e] governing working conditions," the unilateral denial of that increment would constitute a modification thereof without the negotiation mandated by *N. J. S. A.* 34:13A–5.3 and would thus violate *N. J. S. A.* 34:13A–5.4(a) (5). Such conduct by a public employer would also have the effect of coercing its employees in their exercise of the organizational rights guaranteed them by the Act because of its inherent repudiation of and chilling effect on the exercise of their statutory right to have such issues negotiated on their behalf by their majority representative.

We must accordingly determine whether payment of the salary increment withheld by the Board constituted an element of the *status quo* whose continuance could not be disrupted by unilateral action. The answer to this question turns, to some extent, on whether the annual step increments in the teachers' salaries were "automatic," in which case their expected receipt would be considered as part of the *status quo,* or "discretionary," in which case the grant or denial of the salary increases would be a matter to be resolved in negotiations.

▮ Analytically helpful in this inquiry is stating the issue in an alternative manner — could the Board have been found to have violated the Act if it had granted, rather than withheld, the salary increments. Under the rationale of *Katz, supra,* the answer to the question is in the affirmative if the increments were discretionary and in the negative if

conditions of public employment is not limited in its applicability to the period of negotiation for a new collective agreement. Rather, it applies at all times and is thus more expansive than the *Katz* rule. *Cf. NLRB v. Acme Industrial Co.*, 385 *U. S.* 432, 436, 87 *S. Ct.* 565, 568, 17 *L. Ed.* 2d 495 (1967) ("* * * duty to bargain unquestionably extends beyond the period of contract negotiations and applies to labor-management relations during the term of an agreement.") ; *NLRB v. C. & C. Plywood Corp.*, 385 *U. S.* 421, 425, 87 *S. Ct.* 559, 17 *L. Ed.* 2d 486 (1967).

they were automatic. See 369 *U. S.* at 746–47, 82 *S. Ct.* 1107. In *Katz,* the Supreme Court

> * * * distinguished between automatic and discretionary wage increases and held that discretionary increases during contract negotiations violated the employer's duty to bargain in good faith. Automatic increases are sanctioned because they do not represent actual changes in conditions of employment but continue the status quo in the sense that they perpetuate existing terms and conditions of employment. Because the employees expect these benefits and readily recognize them as established practice, the increases do not tend to subvert employee's support for their bargaining agent or disrupt the bargaining relationship.
>
> > [*NLRB v. John Zink Co.,* 551 *F.* 2d 2d 799, 801 (10 Cir. 1977)]

In the instant case, PERC took the position that the payment of the scheduled annual salary increment was one of the existing terms and conditions of employment for the employees represented by the Association. It thus viewed the Board's failure to pay the increment upon the start of the new school year to constitute a unilateral alteration of the *status quo.* PERC felt that the payment of the annual step increment was "automatic" in the sense that the teachers' entitlement thereto was established by the commencement of an additional year of teaching service.[10] PERC's reasoning is consistent with *Katz, supra:* if the unilateral grant of an automatic scheduled increase is not unlawful, then the withholding of that same increase would be an unlawful unilateral change in the *status quo.*

The Board, however, argues that the payment of the annual increment was not part of the *status quo* and that by not paying the increments it was maintaining the *status quo* exactly as it had been under the 1974–75 agreement until the negotiations resulted in a new agreement. PERC

---

[10]There is no allegation in this case that the increments for all teachers in the school system were withheld for cause pursuant to *N. J. S. A.* 18A:29–14.

rejected this argument by noting that the 1974–75 agreement contained a salary schedule specifying annual increments for each additional year of service. PERC found that the payment of salaries according to this schedule was one of the existing terms and conditions of employment under the 1974–75 agreement. Holding that those working conditions continued in effect after the expiration of that agreement until modified in negotiations, PERC ruled that upon the start of a new school year, which was the only condition precedent to a "step-up" in the salary schedule, the teachers were entitled to payment of a salary at the next step specified in the schedule.

We need not consider the general issue of whether the terms and conditions of employment which prevailed under a previous collective agreement constitute the *status quo* after its expiration because in this case a specific statute applies to command that conclusion with respect to the payment of increments according to the salary schedule. By entering into the 1974–75 collective agreement with the Association, the Board adopted the salary schedule contained therein. *N. J. S. A.* 18A:29–4.1 authorizes boards of education to adopt salary schedules for its full-time teachers and further provides:

Such policy and schedules shall be binding upon the adopting board and upon all future boards in the same district for a period of two years from the effective date of such policy but shall not prohibit the payment of salaries higher than those required by such policy or schedules nor the subsequent adoption of policies or schedules providing for higher salaries, increments or adjustments.

Pursuant to this statute, the salary schedule adopted by the Board in 1974 for the 1974–75 school year was binding upon it for the 1975–76 school year or until the schedule was modified as provided in the statute.[11] Since no new schedule

---

[11]The language of *N. J. S. A.* 18A:29–4.1 is mandatory and binds a board of education to the terms of the salary schedule for the two year period. See *Cliffside Park Bd. of Education v. Mayor and Council of Cliffside Park,* 100 *N. J. Super.* 490, 493 (App. Div. 1968).

had been adopted by the Board, the 1974–75 salary schedule remained operative as of the start of the 1975–76 school year and obligated the Board to pay the salary increments specified therein, subject, of course, to its right under *N. J. S. A.* 18A:29–14 to refuse to do so in individual cases. By paying the teachers the same salaries they had received for the 1974–75 school year, the Board was not compensating the teachers according to the salary schedule then in effect. As a matter of statutory compulsion, the payment of the scheduled increments for the 1975–76 school year *constituted* an element of the *status quo*.[12]

 Since the payment of the salary increments herein should have been automatic upon the start of the new school year in September 1975, PERC correctly determined the Board's unilateral withholding of the increments contravened *N. J. S. A.* 34:13A–5.3. We affirm its ruling that the Board's conduct constituted an unlawful refusal to negotiate in good faith in violation of *N. J. S. A.* 34:13A–5.4(a) (5) and, corollarily, an unlawful interference with its employees' exercise of their statutory rights in violation of *N. J. S. A.* 34:13A–5.4(a) (1).

The judgment of the Appellate Division is reversed. Those portions of PERC's order as to which enforcement was sought are hereby enforced.

CONFORD, P. J. A. D. (temporarily assigned), concurring. I agree with the judgment and all of the opinion of the

---

[12]The existence of the statutory obligation renders inapposite the decision of the New York Court of Appeals in *Bd. of Co-Op Ed. Services v. N. Y. S. Public Employment Relations Board*, 41 *N. Y.* 2d 753, 395 *N. Y. S.* 2d 439, 363 *N. E.* 2d 1174 (1977) relied upon by the Board. The dispositive factor there was the lack of any contractual compulsion to pay the salary increments withheld, since the collective agreement calling for their payment had expired. Apparently no statute comparable to *N. J. S. A.* 18A:29–4.1 presently exists in New York. The non-existence of any contractual obligation for the Board to pay the increments in the instant case is irrelevant in light of that statute.

Court except its determination that the withholding of the increments by the Board during negotiations was a violation of that provision of *N. J. S. A.* 34:13A–5.3 which prohibits unilateral modification by the employer of "existing rules governing working conditions" without negotiation with the union (pp. 48–49).

What the Board did here was to alter compensation, not "working conditions." Common parlance in labor relations law and practice distinguishes between compensation and working conditions. However they are together comprehended by the term "terms and conditions of employment." PERC here held that the Board's altering existing terms and conditions of employment, (using that term in its collective sense) during negotiations for a new contract constituted a failure to negotiate and consequently an unfair labor practice, contrary to *N. J. S. A.* 34:13A–5.4(a) (1) and (5). It is sufficient for our holding here that we sustain PERC's action in that respect, without straining to uphold its decision on the added ground of unilateral change in "working conditions," a concept not here relevant.

CONFORD, P. J. A. D., concurring in the result.

*For reversal*—Chief Justice HUGHES, Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER and Judge CONFORD—7.